NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4335-14T2

CUMBERLAND FARMS, INC.,

       Plaintiff-Appellant/
       Cross-Respondent,

v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION and
THE ADMINISTRATOR OF THE NEW
JERSEY SPILL COMPENSATION
FUND,

       Defendants-Respondents/
       Cross-Appellants.

 

> **APPROVED FOR PUBLICATION**
>
> **November 2, 2016**
>
> **APPELLATE DIVISION**

Argued October 17, 2016 — Decided November 2, 2016

Before Judges Sabatino, Haas and Currier.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1368-13.

Mark E. Tully (Goodwin Procter, LLP) of the Massachusetts bar, admitted pro hac vice, argued the cause for appellant/cross-respondent (Archer & Greiner, Mr. Tully and Chad W. Higgins (Goodwin Procter, LLP) of the Massachusetts bar, admitted pro hac vice, attorneys; Mr. Tully, Mr. Higgins, and Nicholas J. Lochetta, II, on the briefs).

Leonard Z. Kaufmann argued the cause for respondents/cross-appellants (Christopher S. Porrino, Attorney General, and Cohn Lifland Pearlman Herrmann & Knopf, LLP, attorneys;

Mr. Kaufmann, Barry A. Knopf, and Gwen Farley, Deputy Attorney General, on the briefs).

The opinion of the court was delivered by

HAAS, J.A.D.

Plaintiff Cumberland Farms, Inc. ("CFI") appeals from the Law Division's April 15, 2015 order dismissing its complaint seeking to enforce an alleged settlement with defendants New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund (collectively "the DEP") that purportedly resolved natural resource damage claims the DEP had asserted under the New Jersey Spill and Compensation Act, N.J.S.A. 58:10-23.11 to -23.50 ("the Spill Act"). The DEP has filed a cross-appeal from a provision in the same order granting judgment to CFI on its breach of the implied covenant of good faith and fair dealing claim, and ordering CFI and DEP to continue settlement negotiations.

Having reviewed the parties' contentions in light of the record and applicable law, we affirm the trial court's dismissal of CFI's breach of contract, specific performance, promissory estoppel, and declaratory judgment claims. However, on the DEP's cross-appeal, we reverse the trial court's decision granting judgment to CFI on its breach of the implied covenant of good faith and fair dealing claim.

We derive the following facts and procedural history from the record developed during the two-day bench trial. Under the Spill Act, the DEP may seek damages against a responsible party for the loss of use of natural resources adversely affected by the party's discharge of hazardous substances. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 393 N.J. Super. 388, 399-400 (App. Div. 2007) (citing N.J.S.A. 58:10-23.11f(a)(1) and -23.11q). In an attempt to encourage responsible parties to voluntarily settle their potential natural resource damages ("NRD") liability, the DEP published Policy Directive 2003-07 ("the Directive") in September 2003. Id. at 395. The Directive, which by its terms created "no enforceable rights, legal or equitable, for any person," laid out the DEP's procedures and formulae for resolving NRD claims. In order to take advantage of the settlement process, responsible parties had to notify the DEP prior to January 2, 2004 of their intention to settle any potential NRD claims.

CFI owns numerous convenience stores and service stations in New Jersey. On December 31, 2003, CFI's attorney sent a letter to the Commissioner of the DEP advising that "CFI would like to voluntarily enter into good faith discussions with the [DEP] concerning any potential NRD claims at this time. . . ."

In May 2004, CFI identified twenty-three of its sites as candidates for settlement. CFI later notified the DEP of another fifty-five potential sites where it faced potential NRD liability.

At trial, CFI called the Administrator of the DEP's Office of Natural Resource Restoration ("ONRR"), John Sacco, as a witness. Sacco testified that he and his staff member, Vicky Galofre, did not have the authority to approve NRD settlements. Instead, Sacco stated that he and Galofre only had the "authority to take part in negotiation, [and] come to an understanding of terms" with the responsible party. Once Sacco knew the terms of a proposed settlement, he had to "go to [his] respective management teams and make a recommendation or start a discussion and then . . . at that point get the authority to finalize a document for settlement."

According to Sacco, proposed settlements proceeded through "a very iterative process. It goes back and forth quite often." There were repeating rounds of analysis between the ONRR, the DEP's management teams, and the New Jersey Division of Law, which provided legal advice to the DEP. The attorneys for potential responsible parties engaged in a similar process with their clients and experts. During this process, which normally took months to complete, the parties exchanged numerous drafts

of the proposed settlement agreement, correspondence, and other documents before any enforceable agreement could be struck.

Sacco also testified about the public notice requirement the DEP and responsible parties had to follow before any settlement could be finalized. On January 12, 2006, the Legislature enacted L. 2005, c. 348. This law, which became effective on April 12, 2006, amended N.J.S.A. 58:10-23.11f(b) to provide that a responsible party that had resolved its NRD liability with the DEP "shall not be liable for claims for contribution [from any non-settling responsible parties] regarding matters addressed in the settlement. . . ."

Chapter 348 also added a new provision, N.J.S.A. 58:10-23.11e2, which stated:

> At least 30 days[1] <u>prior to its agreement</u> to any administrative or judicially approved settlement . . . the [DEP] shall publish in the New Jersey Register and on the [DEP's] website the name of the case, the names of the parties to the settlement . . . , the location of the property on which the discharge occurred, and a summary of the terms of the settlement . . . , including the amount of any monetary payments made or to be made. The [DEP] shall also provide written notice of the settlement . . . , which shall include the information listed above, to all other parties in the case and to any other

---

[1] On December 2, 2015, the Legislature increased this thirty-day advance notification requirement to sixty days. L. 2015, c. 166.

> potentially responsible parties of whom the [DEP] has notice at the time of the publication.

Thus, under this new provision, the DEP and a responsible party could not agree to a final settlement of a NRD claim until after public notice of the possible settlement had been provided.

Even prior to the enactment of N.J.S.A. 58:10-23.11e2, however, the settlement agreements negotiated between the DEP and responsible parties included provisions requiring the publication of public notice in the New Jersey Register of a settlement agreement, even if it was already signed. For example, the first settlement agreement the DEP negotiated with CFI involved a site in Ridgefield. This agreement provided that the DEP reserved the right to withdraw from the settlement if the public comments received following the notice "indicate[d] to the [DEP] in its sole discretion, that the [s]ettlement [a]greement is inappropriate, improper, or inadequate." Thus, the DEP retained the right to withdraw from the agreement based upon its review of any comments received from the public or other interested parties.

Prior to the April 12, 2006 effective date of the thirty-day advance public notice requirement established by N.J.S.A. 58:10-23.11e2, the DEP and CFI entered into a written settlement agreement for the remaining twenty-two sites CFI had originally

identified as candidates for potential settlement. As was the case with the Ridgefield settlement, the parties exchanged multiple draft agreements and correspondence before an agreement covering all twenty-two sites was executed. Like the Ridgefield settlement, this agreement required public notice of the settlement, and granted the DEP the right to withdraw from the agreement if, after reviewing any public comments, it determined the agreement was "inappropriate, improper, or inadequate."

At that point, there were fifty-five CFI sites remaining for consideration under the settlement program. The DEP had already initiated litigation to recover NRD damages from CFI for one of these sites, which was located in Berkeley Township. Settlement negotiations involving sites that were already in litigation were handled in the first instance by the DEP's outside litigation counsel, rather than by Sacco or Galofre. CFI's attorney testified that she wanted to keep the other fifty-four sites out of litigation. The DEP agreed with this approach. Therefore, the parties dealt with the Berkeley site separately. Indeed, CFI's attorney testified that none of the correspondence CFI subsequently exchanged with DEP's litigation counsel concerning the Berkley property mentioned the remaining fifty-four sites.

A-4335-14T2

After going through a mediation process, CFI and the DEP's litigation counsel negotiated a settlement of the Berkeley site litigation. On April 12, 2007, DEP's litigation counsel advised CFI's attorney that CFI's "proposed settlement has been approved and accept[ed] by the State." The parties then began a year-long exchange of documents and correspondence until they agreed upon the terms of the agreement. At that point, and in accordance with N.J.S.A. 58:10-23.11e2, the parties arranged for public notice of the unsigned agreement. The DEP "received no comments that disclosed facts or considerations that indicated to the [DEP], in its sole discretion, that the [s]ettlement [a]greement was inappropriate, improper, or inadequate[,]" and the parties consummated the agreement on April 14, 2008, when the final required signature was affixed to the document.

The DEP did not issue a release to CFI concerning the NRD claims relating to the Berkeley site until 2013. At trial, Sacco speculated that the release for that site may have "fell through the cracks."

As part of its settlement of the Berkeley site litigation, CFI agreed to fund the purchase of forty-three acres of land in Cumberland County, which would "be held in trust and for the benefit of the State of New Jersey to remain undeveloped and undisturbed so that the natural resources on and under the

[p]roperty shall remain available for the use and benefit of the citizens of the State." At trial, CFI's attorney asserted that CFI purchased additional acreage at that time that it hoped to use as part of any future settlement of the remaining fifty-four sites. However, CFI did not provide any documentation linking these additional acres of land to the fifty-four sites prior to CFI's purchase of this property.

The remaining fifty-four sites, which are located throughout New Jersey, are the subject of this appeal. On August 3, 2006, Galofre sent an email to CFI's attorney stating, "Please let me know when you are available for a conference call to go over the [fifty-four CFI] sites." It appears there was a subsequent discussion between the attorney and Galofre concerning the sites. On October 20, 2006, Galofre sent the attorney another email stating, "About two months ago we discussed the NRD for [fifty-four CFI] properties. Is [CFI] still interested in settling these [fifty-four] sites?" CFI's attorney responded later that day, expressing continued interest in pursuing a settlement, but stating that CFI's environmental consultants needed to obtain additional information.

When Galofre heard nothing further, she sent an email to CFI's attorney on January 11, 2007, advising that Sacco was considering forwarding the fifty-four sites to the DEP's outside

counsel for litigation. CFI's attorney responded that same day, stating CFI was still interested in negotiating a settlement.

Five months later, CFI's attorney sent Galofre an email on June 14, 2007, stating that CFI

> has authorized me to propose [36.99] additional acres that will be purchased by The Nature Conservancy to satisfy CFI's potential NRD liability at the remaining sites we were discussing. This offer is made without prejudice and solely in an attempt to resolve a bona fide dispute and CFI is making no admissions of fact or law.

The next day, Galofre thanked CFI's attorney for the email and stated that she would "review this and will be in touch with you about it." On June 20, 2007, Galofre sent the following email to CFI's attorney:

> I have reviewed the proposal made by CFI as stated in your email dated 6/14/07, below, and discussed this proposal with John Sacco. [The] ONRR is satisfied with this proposal, therefore attached find a draft settlement agreement for your review. Please see Appendix B, that lists the sites, and fill in the missing block and lot numbers and program identification numbers. If you have comments to the draft[,] also provide them. However, note that [the] ONRR will not make changes to boilerplate language especially not to the definition of "Natural Resource Damages[.]" Thank you.

As noted above, Sacco, Galofre, and the ONRR did not have the authority to approve a settlement with CFI or any other potential responsible party in a NRD case. Instead, their task

was to flesh out the terms of any proposed agreement and then forward it to their management teams for review and possible approval.

Mindful of the bounds of the ONRR's limited authority, the "draft settlement agreement" that Galofre sent to CFI's attorney was a template the ONRR used as the starting point for its negotiations. There were numerous blank spaces, strikeouts, and "redlines" throughout the form. The template listed CFI's name and address, and identified the fifty-four sites that were under discussion. The form also included CFI's proposal to fund the purchase of approximately 36.99 acres of land. The provision stating the amount of money CFI would pay the DEP for its "oversight costs" was left blank, and the dates by which certain steps would have to be completed were not included in the document.

The draft agreement included a provision that stated, "This [s]ettlement [a]greement shall be effective upon the execution of this [s]ettlement [a]greement by the Department" and CFI. In addition, by operation of N.J.S.A. 58:10-23.11e2, prior to DEP's agreement to any settlement, the terms of the contract had to be published in order to give the public the opportunity to comment on them.

At trial, Sacco confirmed that, aside from the number of acres of land CFI proposed to purchase, the remainder of the draft settlement agreement was "still a work in progress." Sacco described the draft as "basically a template that we send out." He stated that other than the "terms of the compensation[,] . . . the rest of it was yet to be determined how it would look." CFI's trial counsel specifically asked Sacco, "[W]hat are you suggesting was still subject to negotiation?" Sacco replied, "It would be the entirety of the document."

Nevertheless, CFI's attorney testified that after CFI received the draft settlement agreement from Galofre on June 20, 2007, "we had a deal." During cross-examination, however, the DEP's trial counsel read the following portion of CFI's attorney's deposition testimony into evidence:

> Q. So there is no currently existing document to which you would expect [the] DEP to affix -- defendants to affix their signature, correct?
>
> A. Not that I've seen.

CFI's attorney did not respond to Galofre's June 20, 2007 email. On July 25, 2007, Galofre sent the attorney an email stating, "Please email me and tell me the status of your review of the settlement document, attached, for the additional [fifty-four] sites." CFI's attorney did not answer this email either.

A-4335-14T2

In August 2008, Galofre sent an email to CFI's attorney stating that she was leaving the ONRR and that another staff member, Pam Lange, would "be taking over the [CFI] matter, the [fifty-four] volunteer service stations[.]" The attorney sent an email thanking Galofre, but provided no substantive response to her previous requests for a status report.

CFI's attorney testified that she tried to call Lange on one occasion, but did not speak to her. The attorney never contacted Sacco to discuss the draft settlement agreement or to engage in negotiations. As the months turned into years, Sacco testified "there was still no response from CFI to continue with it." Sacco explained that CFI's attorney was aware of the iterative process from the "three previous deals . . . [a]nd I think was pretty clear of what were the next steps. We made our couple of overtures and we never heard back. And you know it just -- we moved on with other things."

Sometime in 2012, the DEP added CFI as a defendant to a lawsuit it had filed in 2007 in the Southern District of New York. In that action, the DEP sought to recover compensation for the public for contamination caused by the discharge of a chemical that was added to gasoline, Methyl Tertiary Butyl Ether ("MTBE"), at approximately 5000 sites throughout New Jersey. With the addition of CFI, the fifty-four sites at issue in this

13                                                          A-4335-14T2

appeal were included in the contaminated sites for which the DEP sought compensation. One of the CFI properties, known as the Baker's Waldwick site, was designated as a "bellwether site" that would be tried during the first phase of the MTBE litigation.

On September 13, 2012, CFI's attorney sent a letter to the DEP's trial counsel in the MTBE litigation. In the letter, CFI's attorney claimed that it and DEP had settled the DEP's NRD claims for the fifty-four sites on June 20, 2007. On December 4, 2012, DEP's attorney responded with a letter stating, "Although I am aware that settlement discussions occurred several years ago as to a number of sites and that some were settled, I have seen no documentation that such discussions actually resulted in an enforceable settlement of the scope you reference."

On June 20, 2013, six years after Galofre sent CFI's attorney the draft settlement agreement for the fifty-four sites, CFI filed a complaint seeking to enforce the alleged final settlement. CFI asserted that the DEP breached the parties' agreement by including the sites in the MTBE litigation, and it sought specific performance of the settlement. CFI also claimed that the DEP breached the implied covenant of good faith and fair dealing "by failing to

consummate the [s]ettlement [a]greement and failing to perform any of [its] obligations under this [s]ettlement [a]greement."

CFI also argued that it partially performed its obligations under the alleged agreement by purchasing property that could be used to satisfy its NRD liability for the fifty-four sites and, therefore, the DEP was estopped from denying the existence of an enforceable contract. Finally, CFI sought a judgment "[d]eclaring that the parties' agreement remains in full force and effect," and requiring the DEP to enter into a settlement agreement "as agreed to and otherwise completing the settlement in this matter."

At the conclusion of testimony, the trial judge rendered an oral decision, rejecting CFI's claim that "the draft settlement agreement" the DEP sent CFI's attorney on June 20, 2007 constituted an enforceable contract. The judge noted that the draft agreement had a number of blanks, redlines, and strikeouts. In addition, neither party had signed the agreement, and no public notice had been provided as required by N.J.S.A. 58:10-23.11e2. The judge found that both Sacco and CFI's attorney[2] testified that "it's an iterative process,"

---

[2] The judge found that Sacco was "an honest witness," but stated he gave "greater weight" to CFI's attorney's testimony. In support of this credibility finding, the judge stated that Sacco testified "that the [DEP] always acts in good faith. And at the
(continued)

involving the exchange of emails "and letters and going back and forth. . . . They go one thing at a time going through it until finally -- the matter is completely resolved."

The trial judge also found that Sacco lacked the authority to approve a settlement and "that it has to go through and be signed by certain people at DEP." In addition, the judge noted that CFI's attorney acknowledged during her deposition testimony that the draft agreement was not in the form required for either party to sign it. Because the judge found there was no valid settlement agreement between CFI and the DEP, he dismissed CFI's breach of contract, specific performance, and declaratory judgment claims.

The trial judge also rejected CFI's promissory estoppel argument. The judge found that CFI had purchased property that it could use to satisfy part of its NRD liability for the fifty-four sites, but had not completed its stated plan of buying all of the acreage necessary to move forward.

---

(continued)
same time he also testified that in the case of the [fifty-four] sites[,] the application fell through the cracks." However, Sacco's comment about something falling through the cracks was limited to the DEP's failure to send CFI a timely release in connection with the Berkeley settlement. He made no similar comment concerning the fifty-four sites involved in this appeal. Therefore, the judge's finding on this point critical of Sacco lacks evidentiary support in the record.

Finally, the trial judge entered judgment in CFI's favor on its breach of the implied covenant of good faith and fair dealing claim. The judge stated "that the DEP needs to resume its negotiations. Whether that means that they actually wind up with an agreement that can be published that's subject to the publication contingency, I can't say. In the end[,] you may not have a settlement agreement." This appeal and cross-appeal followed.

II.

On appeal, CFI argues that the trial judge erred by concluding there was no enforceable settlement agreement between the parties. CFI asserts it made an offer to settle its NRD liability for the fifty-four sites in CFI's attorney's June 14, 2007 letter, and that Galofre's June 20, 2007 email with the attached "draft settlement proposal" constituted an acceptance of that offer. We disagree.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Ibid. (quoting Cesare v.

Cesare, 154 N.J. 394, 411-12 (1998)).  We "should not disturb the factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."  Ibid. (internal quotation marks omitted).

However, we owe no deference to a trial court's interpretation of the law, and review issues of law de novo. State v. Parker, 212 N.J. 269, 278 (2012); Mountain Hill, L.L.C. v. Twp. Comm. of Middletown, 403 N.J. Super. 146, 193 (App. Div. 2008), certif. denied, 199 N.J. 129 (2009).  We also review mixed questions of law and fact de novo.  In re Malone, 381 N.J. Super. 344, 349 (App. Div. 2005).  The interpretation and construction of a contract is a matter of law for the trial court, subject to de novo review on appeal.  Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998); see also Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009) (reviewing the enforcement of a settlement agreement de novo).

"A settlement agreement between parties to a lawsuit is a contract."  Nolan v. Lee Ho, 120 N.J. 465, 472 (1990).  The burden of proving that the parties entered into a settlement

agreement is upon the party seeking to enforce the settlement. Amatuzzo v. Kozmiuk, 305 N.J. Super. 469, 475 (App. Div. 1997).

Since the "settlement of litigation ranks high in our public policy," Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App. Div.), certif. denied sub nom., Jannarone v. Calamoneri, 35 N.J. 61 (1961), "settlement agreements will be honored 'absent a demonstration of fraud or other compelling circumstances.'" Nolan, supra, 120 N.J. at 472 (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 125 (App. Div.), certif. denied, 94 N.J. 600 (1983)). Unless there is "an agreement to the essential terms" by the parties, however, there is no settlement in the first instance. Mosley v. Femina Fashions Inc., 356 N.J. Super. 118, 126 (App. Div. 2002), certif. denied, 176 N.J. 279 (2003).

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958)). "A written contract is formed when there is a 'meeting of the minds' between the parties evidenced by a written offer and an unconditional, written acceptance." Morton v. 4 Orchard Land Trust, 180 N.J. 118, 129-30 (2004) (quoting Johnson & Johnson v.

Charmley Drug Co., 11 N.J. 526, 538-39 (1953)). Thus, "[i]t is requisite that there be an unqualified acceptance to conclude the manifestation of assent." Weichert Co. Realtors, supra, 128 N.J. at 435-36 (quoting Johnson & Johnson, supra, 11 N.J. at 539). "In the very nature of the contract, acceptance must be absolute" and "unequivocally shown." Johnson & Johnson, supra, 11 N.J. at 538.

Applying these principles in this case, we discern no basis for disturbing the trial judge's determination that CFI failed to meet its burden of proving there was an enforceable settlement agreement. The record clearly establishes that the DEP never agreed to do anything more than attempt to negotiate a final settlement through the iterative process, and that CFI never responded to the DEP's overtures.

Both parties knew that Sacco, Galofre, and the ONRR did not have the authority to enter into a binding settlement agreement. Their authority was limited to negotiating with a potential responsible party on the terms of a possible settlement, which then needed to be reviewed and approved by DEP managers. Thus, Galofre never stated in her June 20, 2007 email that DEP management had agreed to settle the matter. Instead, she specifically advised CFI's attorney that she was forwarding a "draft settlement agreement" for the attorney's review.

Contrary to CFI's contention, Galofre's email cannot be read as an "unqualified"; "absolute"; or "unequivocal[]" acceptance of CFI's June 14, 2007 "offer" to settle CFI's NRD liability for the fifty-four sites. Johnson & Johnson, supra, 11 N.J. at 538-39. Instead, as the trial judge found, the emails and the "draft settlement agreement" did not contain the terms necessary to constitute a binding settlement. CFI's attorney's email only referred to the property CFI proposed to fund as part of the settlement. In turn, the draft agreement Galofre sent to the attorney contained numerous redlines, strikeouts, and blanks. As CFI's attorney conceded during her deposition testimony, neither party could sign the agreement in the condition it was in when Galofre started the negotiation process on June 20, 2007.

The fact that CFI's attorney never responded to Galofre's July 25, 2007 email asking the attorney to advise her of the "status of [the attorney's] review of the [draft] settlement document," is also telling. "A contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." Hagrish v. Olson, 254 N.J. Super. 133, 138 (App. Div. 1992) (citing Looman

A-4335-14T2

Realty Corp. v. Broad St. Nat'l Bank of Trenton, 74 N.J. Super. 71, 82 (App. Div.), certif. denied, 37 N.J. 520 (1962)).

It is clear from Galofre's email that the DEP did not believe there was a binding settlement agreement. CFI's attorney did nothing to question the DEP's understanding of the nascent status of the negotiations. Indeed, CFI did not communicate with the DEP concerning the fifty-four sites for over five years and, only then, asserted that its NRD liability for these locations had been settled. Under these circumstances, the trial judge properly rejected CFI's contention that there was an enforceable settlement as of June 20, 2007.

The trial judge's determination is further supported by two additional factors. First, the draft agreement expressly stated that the settlement would not be effective until it was executed by both parties. As the judge observed, this provision was a material term of any resolution of the case. Because neither party signed the marked-up version of the agreement Galofre sent to CFI's attorney on June 20, 2007, there was no final, enforceable contract between the parties.

Second, under N.J.S.A. 58:10-23.11e2, the DEP and a potentially responsible party may not agree to a settlement of NRD liability until after the DEP has published notice of the

22                                                    A-4335-14T2

terms of the settlement. Because the parties never arrived at an understanding of the terms of a final settlement, the DEP was never able, much less required, to publish the notice pursuant to the statute. Therefore, the trial judge properly determined there was no enforceable agreement between the DEP and CFI regarding the fifty-four sites.

Finally on this point, CFI contends that if the parties agreed upon the terms that needed to be included in the notice required by N.J.S.A. 58:10-23.11e2, this "agreement" would constitute a binding contract and the DEP would thereafter be powerless to withdraw from that "agreement" even if it received persuasive negative comments about the proposed settlement during the public comment period following the publication of the notice. Because we have determined that no valid settlement agreement was forged between the DEP and CFI, we need not further address this contention in this opinion. See Indep. Realty Co. v. Twp. of N. Bergen, 376 N.J. Super. 295, 301 (App. Div. 2005) (noting that while the New Jersey Constitution does not confine the exercise of judicial power to actual cases and controversies, "it is well settled that [courts] will not render advisory opinions or function in the abstract").

That having been said, however, we perceive no principled basis for the Legislature to have required in N.J.S.A. 58:10-

23.11e2 that public notice be published of the proposed settlement terms thirty days prior to DEP's agreement to a settlement of a NRD claim if it did not intend for the DEP to be able to consider the public comments received during that period and make a determination whether to consummate, withdraw from, or modify the settlement. See State v. Reynolds, 124 N.J. 559, 564 (1991) ("A construction of a statute that will render any part of a statute inoperative, superfluous, or meaningless, is to be avoided."). Significantly, the parties' prior agreements expressly permitted the DEP to withdraw from the settlements in its sole discretion after it considered the public comments. Paragraphs six and seven of the "draft settlement agreement" Galofre sent to CFI's attorney also contained the template of a similar provision that was not finalized because the parties never agreed to the terms of a settlement in this case.

The DEP's interpretation of the public comment process and its ability to respond to those comments in the public interest as evidenced by the language included in its final agreements is entitled to "great weight as evidence of its conformity with the legislative intent." Malone v. Fender, 80 N.J. 129, 137 (1979). Therefore, we reject CFI's contention on this point.

In sum, CFI failed to prove there was an enforceable settlement agreement. Therefore, the trial judge correctly

dismissed CFI's claims for breach of contract, specific performance, and a declaratory judgment against the DEP.

For similar reasons, the judge also properly rejected CFI's promissory estoppel argument. "The elements of promissory estoppel are '1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment.'" East Orange Bd. Of Educ. v. N.J. Sch. Const. Corp., 405 N.J. Super. 132, 148 (App. Div.) (quoting Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499 (App. Div.), certif. denied, 177 N.J. 224 (2003)), certif. denied, 199 N.J. 540 (2009). As discussed above, there was no "clear and definite promise" by DEP that it would enter into a final settlement agreement with CFI. Thus, CFI cannot demonstrate that it relied upon that nonexistent "promise" in connection with its purchase of additional property that it hoped to use to resolve its NRD liability for the fifty-four sites.

Finally, we are constrained to reverse the portion of the April 15, 2015 order entering judgment in CFI's favor on its claim that the DEP breached the implied covenant of good faith and fair dealing. "[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). The

implied covenant applies to "both the performance and enforcement of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005). Under this "implied covenant . . . 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965) (quoting 5 Williston on Contracts § 670, at 159-60 (3d ed. 1961)).

However, it is well established and CFI concedes, that "[i]n the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." Noye v. Hoffman-La Roche Inc., 238 N.J. Super. 430, 434 (App. Div. 1990). Here, there was no contract between CFI and the DEP. Therefore, the judge should have also dismissed CFI's breach of the implied covenant of good faith and fair dealing claim.

In sum, we affirm the trial court's dismissal of CFI's breach of contract, specific performance, promissory estoppel, and declaratory judgment claims. We reverse the portion of the April 15, 2015 order granting judgment to CFI on its breach of the implied covenant of good faith and fair dealing claim, and remand for the prompt entry of an order dismissing CFI's complaint in its entirety.

Affirmed in part; reversed in part; and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4335-14T2