```
┌─────────────────────────────────────────────────────────┐
│            NOT FOR PUBLICATION WITHOUT THE              │
│          APPROVAL OF THE APPELLATE DIVISION            │
│                                                         │
│ This opinion shall not "constitute precedent or be binding upon any court." │
│ Although it is posted on the internet, this opinion is binding only on the │
│   parties in the case and its use in other cases is limited. R.1:36-3. │
└─────────────────────────────────────────────────────────┘
```

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0619-15T3

THE DIGITAL GROUP, INC.,

    Plaintiff-Appellant,

v.

SAGITEC SOLUTIONS, LLC,

    Defendant-Respondent.

_____

Argued May 31, 2017 — Decided August 18, 2017

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-0216-13.

James P. Flynn argued the cause for appellant (Epstein Becker & Green, PC, attorneys; Mr. Flynn, of counsel and on the briefs; Alkida Kacani, on the briefs).

Ansis V. Viksnins (Lindquist & Vennum) of the Minnesota Bar, admitted pro hac vice, argued the cause for respondent (Bressler, Amery & Ross, and Mr. Viksnins, attorneys; Diana C. Manning, Angela M. Scafuri and Benjamin J. DiLorenzo, on the brief).

PER CURIAM

The claims in this matter arise out of a dispute between two information technology companies: plaintiff, The Digital Group, Inc., and defendant, Sagitec Solutions, Inc. Digital and Sagitec entered into an agreement and submitted a joint proposal to provide pension and administration software services to the Fiji National Provident Fund (FNPF), which administers the state pension system in Fiji. FNPF rejected the joint proposal and subsequently entered into a contract with Sagitec. In its complaint, Digital claims Sagitec's entry into the FNPF contract violated their agreement, and otherwise breached common law duties owed by Sagitec to Digital.

The court granted Sagitec's motion for summary judgment and entered an order dismissing Digital's complaint. Digital appeals the court's order. Having considered the record under the applicable law, we affirm.

## I.

In our review of the record before the trial court, we view the facts and all reasonable inferences therefrom in the light most favorable to Digital because it is the party against whom summary judgment was entered. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Applying that standard, the record before the trial court established the following facts.

Digital is an information technology solutions company that provides software and computer system integration services.

Sagitec provides customized information technology products and services in the area of employee benefits for pension and retirement plans.

Between 2009 and 2013, FNPF issued requests for proposals to upgrade its computer system, the "Provident Fund Management Information System" (ProMIS system). Digital bid unsuccessfully each time. Nevertheless, Digital developed a relationship with FNPF through other projects and in 2011 was granted "preferred supplier" status. As a preferred supplier, FNPF had discretion to engage Digital for information technology services when required.

In January 2013, FNPF invited Digital to respond to a restricted tender for a contract for the implementation of the ProMIS system.[1] Sitiveni Nabuka was a member of the FNPF committee responsible for selecting a vendor for the ProMIS system. Nabuka informed Digital that Sagitec had a software program, Neospin, that satisfied FNPF's needs. Based in part upon Nabuka's recommendation, Digital contacted Sagitec and advised that it had a client opportunity regarding a pension administration and management system.

On January 15, 2013, Digital and Sagitec executed a "Non-Disclosure, Confidentiality & Non-Disintermediation Preliminary

---

[1] The tender was deemed "restricted" because it was sent by FNPF to only selected potential vendors.

A-0619-15T3

Partnership Agreement" (Agreement), with the "inten[t] to enter into a joint working agreement . . . to facilitate a proposed business relationship and partnership between the parties." The provisions of the Agreement pertinent to the allegations in the complaint are: (1) the confidentiality provisions (Sections II through VII, and IX); and (2) the non-solicitation and non-disintermediation covenants (Section X). We detail those provisions here.

<u>Confidentiality Provisions</u>

Digital and Sagitec acknowledged that to "explore common business needs and future partnerships" they might share "certain confidential and proprietary technical, financial, marketing and business information including strategic plans, list[s] of clients and projects, [and] client sensitive information." The parties therefore agreed to "not use all or any . . . [c]onfidential [i]nformation except in the manner set forth in [the] [A]greement."

Section IV of the Agreement defines "confidential information" as follows:

> [A]ll information, know-how, technical, financial or business information or data, product strategies, business strategies, details of the employees, software, data, methods, or processes which are proprietary of one of the parties or its clients, its licensors, its group companies or to any related entity, whether or not in writing, and confidential to the said party and not

4

generally known to other third parties, which either of the party [sic] may obtain knowledge of or access to through delivery of such from the other party under this Agreement. Confidential [i]nformation also includes that information described above whether or not owned or developed by either of the parties.

Section V required the parties "to maintain the confidentiality of the [c]onfidential [i]nformation." The obligation to maintain confidentiality did not apply where the confidential information:

(i) [w]as already in their possession prior to disclosure and such was received without obligation of confidentiality;

(ii) [w]as independently developed prior to this relationship by the other party . . . .

Section VII of the Agreement provided that the "furnishing of the [c]onfidential [i]nformation . . . shall not obligate either party to enter into any further agreement or negotiation with the other for any proposed business relationship," or "refrain either of the parties from entering into an agreement with any other party."

Section IX of the Agreement defined the parties' obligation to "not commercially use or disclose any [c]onfidential [i]nformation or any materials derived there from to any other person or entity other than persons in direct employment of the [r]eceiving [p]arty, who have a need to have access to and

5

knowledge of the [c]onfidential [i]nformation, solely for the purpose authorized above."

Non-solicitation and Non-disintermediation

Section X of the Agreement, titled "non-disintermediation," provides:

> [F]or the agreement term [and] for a period of two years following the agreement term of this or any other working agreement or working relationship, any employees, contractors or clients (including client personnel and managers) of either party introduced to the other [] under this . . . agreement or any subsequent partnership agreement are not to be approached or solicited by the other party directly or indirectly for any direct or indirect business (non-solicitation covenant) or employment relationship (no-hire covenant) outside of the mutually agreed to partnership between the two parties as this would create disintermediation risk and associated direct and indirect losses for the other party.

The Agreement's effective date was January 15, 2013, and had a one-year term, unless it was otherwise terminated by the parties. Either party could terminate the Agreement by providing thirty days written notice of termination, but the parties agreed the "confidentiality and non-disclosure covenants . . . survive[d] indefinitely [] after [] termination."[2]

---

[2] The Agreement also provides that any dispute between the parties is governed by "the laws of the United States," and "subject to the jurisdiction of courts exercising competent jurisdiction and situated in New Jersey."

The Joint Proposal and Review Period

On February 11, 2013, Digital and Sagitec submitted a joint proposal to FNPF for the ProMIS system contract. During the review period that followed the submission of the proposal, Digital maintained communication with Nabuka, who at various times provided Digital with information concerning the FNPF selection committee's review of the proposal. In May 2013, Nabuka sent Digital an email advising that FNPF had concerns about Digital's reputation and might seek to contract with Sagitec only.

During the review period, Piyush Jain, one of Sagitec's principals, also became aware of Digital's reputational issues, including allegations Digital had a history of offering inducements to information technology departments to obtain business. Despite Sagitec's concerns with Digital's reputation and business practices, it remained willing to work jointly with DIGITAL on the ProMIS system opportunity with FNPF, and to enter into a new working agreement with Digital.

In August 2013, FNPF sent Sagitec correspondence indicating it intended to approve Sagitec as the preferred provider for the ProMIS system contract. However, FNPF sought to enter into a contract only with Sagitec, and requested "a '[l]etter of [i]ndemnity' and/or '[l]etter of [n]o [o]bjection' from DIGIT Digital . . . with regards to the sole engagement of Sagitec."

Digital objected and insisted that it be a signatory to any contract with FNPF for ProMIS system work.[3] Nabuka advised Digital that if it did not provide a "no objection letter," FNPF could close the tender without awarding the contract.

On September 2, 2013, Digital informed Sagitec that its inclusion as a signatory on any contract with FNPF was "non-negotiable." On September 20, 2013, Sagitec sent Digital a notice to terminate the Agreement, thereby ending the parties' business relationship on October 20, 2013.

On October 9, 2013, FNPF formally rejected the joint proposal of Sagitec and Digital, advising them "that [the joint proposal] has been unsuccessful," and no other tenderer was successful. Sagitec responded to the e-mail stating that the company was "disappointed with the outcome" and thanked FNPF for its consideration.

Four days later, on October 13, 2013, FNPF sent Sagitec correspondence asking it to submit a proposal for pension administration solutions. Sagitec responded to FNPF's request, a

---

[3] After it became apparent FNPF would not enter into a contract with Digital as a signatory and sought only a contract with Sagitec, Digital sent Sagitec a proposed "master agreement" pursuant to which Digital would be Sagitec's exclusive regional partner and representative in the Asia Pacific region. The proposed master agreement became a source of disagreement between Digital and Sagitec, and Sagitec never agreed to its terms.

A-0619-15T3

period of contract negotiations ensued, and in May 2014, Sagitec entered into a contract with FNPF for the provision of services related to the ProMIS system.

Digital's Lawsuit

On November 13, 2013, Digital filed an order to show cause seeking temporary restraints against Sagitec from doing business with FNPF, and a complaint asserting: breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment; breach of fiduciary duty; tortious interference with prospective economic advantage; and a claim for equitable relief seeking a temporary restraining order preventing Sagitec from working with FNPF or any other parties to whom Digital introduced Sagitec.[4] The request for restraints was denied.

Following the completion of discovery, the parties cross-moved for summary judgment. After hearing argument, the court issued an order and comprehensive written opinion granting Sagitec's motion and dismissing the complaint.[5] The court found

---

[4] Sagitec filed an answer and a counterclaim alleging Digital tortiously interfered with Sagitec's contract with FNPF. Sagitec's counterclaim was voluntarily dismissed.

[5] The court's grant of Sagitec's motion effectively denied Digital's cross-motion for summary judgment. The court, however, did not enter an order denying Digital's motion. Digital does not argue on appeal that the court erred by denying its request for summary judgment and, therefore, we do not address the court's implicit denial of Digital's cross-motion. An issue not briefed

that the undisputed facts showed "the conduct that forms the basis for Digital's breach of contract claim [does not], according to the plain terms of the [Agreement]," constitute a breach of contract. The court determined that Sagitec did not violate the non-solicitation covenant because it did not bar Sagitec from "communicating, negotiating, doing business, or contracting with customers if the customers [] approached or solicited Sagitec," and Sagitec did not approach or solicit FNPF. The court also found there was no evidence showing that "Sagitec solicited or approached FNPF," but rather the undisputed facts established FNPF "asked Sagitec to make a proposal independently."

The court also rejected Digital's claim that Sagitec violated the Agreement's prohibition against the use of confidential information. The court found that "a covenant prohibiting disclosure of confidential information does not and cannot preclude use of information that is no longer confidential and likely was not confidential in the first place." Thus, the court granted Sagitec's motion for summary judgment and dismissed Digital's breach of contract claim.

---

on appeal is deemed waived. <u>Jefferson Loan Co. v. Session</u>, 397 <u>N.J. Super.</u> 520, 525 n.4 (App. Div. 2008); <u>Zavodnick v. Leven</u>, 340 <u>N.J. Super.</u> 94, 103 (App. Div. 2001).

A-0619-15T3

The court dismissed Digital's cause of action for breach of the covenant of good faith and fair dealing, finding there was no evidence Sagitec took any action in bad faith to deprive Digital of the benefits of the Agreement. The court rejected the unjust enrichment claim because it was based on an alleged breach of the Agreement. The court also found Digital could not sustain its breach of fiduciary duty claim because Digital did not present evidence establishing Sagitec owed a fiduciary duty to Digital. Last, the court dismissed Digital's tortious interference claim because Digital did not present evidence showing it had a reasonable expectation of an economic benefit from FNPF or that Sagitec acted to maliciously interfere with any alleged prospective economic of Digital. Following entry of the order granting summary judgment to Sagitec, Digital filed this appeal.

II.

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The "'judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' in viewing the facts in the

11

light most favorable to the non-moving party." Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 329 (2010) (quoting Brill, supra, 142 N.J. at 540) (alteration in original). "[W]hen the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." Brill, supra, 142 N.J. at 540 (internal quotation marks and citation omitted).

On appeal, we employ the same standard of review that governs the trial court. Henry, supra, 201 N.J. at 330. We must first decide whether there is an issue of material fact, and if none exists, then decide whether the trial court's ruling on the law was correct. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998). When reviewing the trial court's ruling on a legal issue, our review is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We first consider Digital's contention that the court erred by granting Sagitec's motion for summary judgment on the breach of contract claim. Digital argues there were genuine issues of material fact precluding the award of summary judgment and that the court erred as a matter of law in its interpretation of the Agreement's provisions. We are not persuaded.

12

To establish its breach of contract claim, Digital was required to prove: "first, that '[t]he parties entered into a contract containing certain terms'; second, that '[Digital] did what the contract required [it] to do'; third, that '[Sagitec] did not do what the contract required [it] to do[,]' defined as a 'breach of the contract'; and fourth, that '[Sagitec's] breach, or failure to do what the contract required, caused a loss to [Digital].'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (quoting Model Jury Charge (Civil), § 4.10A "The Contract Claim — Generally" (May 1998)).

"Well-settled contract law provides that '[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)). "Contracts should be read 'as a whole in a fair and common sense manner.'" Manahawkin, supra, 217 N.J. at 118 (2014) (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)).

"If the language of a contract 'is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'" Ibid. (quoting Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011)). However,

13

"[w]hen the provision at issue is subject to more than one reasonable interpretation, it is ambiguous, and the 'court may look to extrinsic evidence as an aid to interpretation.'" Cypress Point, supra, 226 N.J. at 415-16 (quoting Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016)).

The Alleged Violations of the Confidentiality Provisions

Digital argues the evidence showed that Sagitec breached the confidentiality provisions of the Agreement by using confidential information Digital provided to Sagitec during their joint effort to obtain the award of the FNPF contract. More particularly, Digital asserts that the confidential information Sagitec allegedly wrongfully used consisted of FNPF's identity as a potential customer, Digital's insights concerning FNPF and the ProMIS system, and information concerning FNPF's pricing and other preferences. Digital contends it provided the confidential information to Sagitec during the preparation and submission of their unsuccessful joint proposal to FNPF.

The court rejected Digital's arguments based on its conclusion that "a covenant prohibiting disclosure of confidential information does not and cannot preclude the use of information that is no longer confidential and likely was not confidential in the first instance." The court did not make express findings

14

concerning Digital's claim that the information it provided constituted confidential information under the Agreement, or whether Sagitec used the information in violation of the Agreement. Nevertheless, based on our de novo review of the record, we are convinced that even assuming the information was confidential under the Agreement, there was no evidence Sagitec used the information in violation of the Agreement.

In considering Digital's claim that Sagitec breached the Agreement by using confidential information, we first observe that Section IX prohibits commercial "use or disclos[ure]" of confidential information. Here, Digital claims only that the purported confidential information was wrongfully used by Sagitec in its response to FNPF's October 2013 request for a proposal for information technology services and its subsequent contract negotiations with FNPF to provide those services. Thus, it was necessary for Digital to prove that Sagitec used confidential information as defined in the Agreement in its response to FNPF's October 2013 request and in Sagitec's subsequent entry into the May 2014 contract with FNPF.

Digital argues the confidential information Sagitec used included the identity of FNPF as a potential customer. The parties debate whether the identity of FNPF constituted confidential information under the Agreement. However, we find it unnecessary

A-0619-15T3

to resolve their competing contentions because even assuming the identity of FNPF constituted confidential information under the Agreement, there is no evidence Sagitec used FNPF's identity to negotiate or enter into the May 2014 contract.

To the contrary, the undisputed facts establish that FNPF was aware of Sagitec in 2012, before the parties entered into the Agreement,[6] and used its knowledge of Sagitec's identity to contact Sagitec after it rejected the parties' joint proposal in September 2013. Thus, there is no evidence Sagitec used Digital's purported confidential disclosure of FNPF as a potential client to obtain the contract from FNPF.

Digital also contends it provided Sagitec with other confidential information, including insights related to the joint proposal such as FNPF's pricing and other preferences. We again need not decide whether the purported confidential information, which is only vaguely described in Digital's submissions, constitutes confidential information as defined in the Agreement. Digital's claim that Sagitec violated the Agreement by using the purported confidential information is untethered to any factual support in the record. See <u>Cortez v. Gindhart</u>, 435 <u>N.J. Super.</u>

---

[6] The evidence showed that FNPF requested information from Sagitec's marketing department in 2012, and that Digital first learned about Sagitec from Nabuka in January 2013.

A-0619-15T3

589, 605 (App. Div. 2014) (observing that competent opposition requires competent evidential material beyond mere speculation and fanciful arguments), certif. denied, 220 N.J. 269 (2015). The record is devoid of any evidence that Sagitec used any of the purported confidential information in its interactions with FNPF leading to the entry of the May 2014 contract. For that reason, the court correctly dismissed Digital's claim that Sagitec breached the Agreement's confidentiality requirements.

The Alleged Violations of the Non-Solicitation Covenant

Digital also claims Sagitec violated the Agreement's prohibition against soliciting its clients. Section X of the Agreement prohibited Sagitec from "approach[ing] or solicit[ing]" any of Digital's clients for "any direct or indirect business" during the term of the Agreement and the two years following its termination. The court dismissed the claim, finding the undisputed facts established that Sagitec did not solicit FNPF, that FNPF solicited Sagitec to enter into the negotiations leading to the May 2014 contract, and that the Agreement did not prohibit Sagitec from communicating, negotiating, doing business, or contracting with FNPF. We agree.

In our interpretation of a contract, the agreement's terms "are to be given their plain and ordinary meaning." M.J. Paquet v. N.J. DOT, 171 N.J. 378, 396 (2002); Roach v. BM Motoring, LLC,

228 N.J. 163, 174 (2017). "On the other hand, when in the context of the document itself and the transaction to which it pertains the terminology employed, despite a facile simplicity, actually is not free from doubt as to its meaning," a court may consider extrinsic evidence of the circumstances "bearing on the alleged proper interpretation of the language used." Schor v. FMS Financial Corp., 357 N.J. Super. 185, 192 (App. Div. 2002).

The trial court observed that the term "solicit" is ordinarily defined as follows: "to entreat, urge or petition persistently."[7] When the parties entered the Agreement in 2013,[8] Black's Law Dictionary similarly defined "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition" or "[a]n attempt or effort to gain business." Black's Law Dictionary 1194 (9th ed. 2009).[9] Courts have consistently

---

[7] The court relied on the definition of "solicit" found in Webster's II New College Dictionary 1050 (1999).

[8] We note the definition from a dictionary published closest to the year the parties entered the Agreement in an effort to adhere to one of our functions in contract interpretation: "to consider what is written in the context of the circumstances at the time of drafting." Pacifico v. Pacifico, 190 N.J. 258, 266 (2007).

[9] The trial court also relied on the definition of "solicit" contained in the sixth edition of Black's Law Dictionary. Black's Law Dictionary 1392 (6th ed. 1990). The ninth edition, which was published in 2009, and available at the time the parties entered the Agreement, does not include a definition of "solicit," and instead defines "solicitation." Black's Law Dictionary 1194 (9th ed. 2009). It also defines "solicitor" as "[a] person who seeks

18

interpreted the term "solicit" with an analogous meaning. See, e.g., Meyer-Chatfield v. Century Bus. Servicing, Inc., 732 F. Supp. 2d 514, 520 (E.D. Pa. 2010) (defining "solicit" as including conduct such as appealing, applying, asking or personally petitioning another individual to obtain something from them, as set forth in Black's Law Dictionary 1392 (6th ed. 1990)); Akron Pest Control v. Radar Exterminating Co., Inc., 455 S.E. 2d 601, 602-03 (Ga. Ct. App. 1995) (relying upon the definition of "solicit" as set forth in Black's Law Dictionary 1392 (6th ed. 1990)).

The trial court therefore properly found that the plain and ordinary meaning of the term "solicit" requires an affirmative act taken by one party — a solicitor — to obtain something from another party. By extension, solicitation requires more than the mere acceptance of, or response to, an offer. See Meyer-Chatfield, supra, 732 F. Supp. at 520 (finding that solicitation requires an "affirmative action on the part of the solicitor," and not "merely accepting business"); Wachovia Ins. Servs. v. Fallon, 682 S.E. 2d, 662 (Ga. Ct. App. 2009) (rejecting a claimed violation of a non-solicitation agreement because the defendant "did not solicit or

business or contributions from others." Ibid. The definitions of "solicitation" and "solicitor" remain unchanged in the more current, 2014 publication. Black's Law Dictionary 1607-08 (10th ed. 2014).

induce the employees; instead, they approached him"); <u>Akron Pest Control</u>, <u>supra</u>, 455 <u>S.E.</u> 2d. at 603 (finding no violation of a non-solicitation agreement based on the defendants' acceptance of business they did not seek out, but which was offered without any affirmative request).

In dismissing Digital's breach of contract claim, the court correctly applied the ordinary meaning of the term "solicit." The undisputed facts showed that Sagitec never petitioned or requested business from FNPF following FNPF's rejection of the joint proposal, but rather FNPF unilaterally contacted Sagitec in October 2013 seeking a potential contract partner for the provision of information technology services. There is no evidence in the record to the contrary.

The non-solicitation covenant also barred Digital and Sagitec from "approach[ing]" each other's clients "directly or indirectly for any direct or indirect business . . . outside of the mutually agreed to partnership." Although the trial court found the undisputed facts showed "Sagitec did not solicit or approach FNPF for business," the court did not directly address Digital's claim that Sagitec approached FNPF in violation of the non-solicitation covenant. However, based on our de novo review, we nevertheless conclude that the undisputed facts also establish that Sagitec did not approach FNPF in violation of the non-solicitation covenant.

See Cumberland Farms, Inc. v. New Jersey Dep't of Envtl. Prot., 447 N.J. Super. 423, 438 (App. Div. 2016) ("The interpretation and construction of a contract is a matter of law . . . subject to de novo review on appeal."), certif. denied, 229 N.J. 149 (2017).

Relying upon an internet dictionary, Digital argues the term "approach" has multiple definitions, two of which are applicable to the Agreement's non-solicitation covenant.[10] Digital does not dispute that the first definition of "approach," "to present, offer or make a proposal or request to," is consistent with the term "solicit." As such, that definition does not support Digital's contention that Sagitec violated the non-solicitation covenant. As noted, the record establishes that Sagitec's entry into the May 2014 contract was the result of a request made by FNPF to Sagitec.

_____

[10] Digital suggests that what it denominates as the primary definition of "approach," "to come near or nearer to," required a denial of Sagitec's motion because under that definition Sagitec could not "sidle up to" FNPF. In the dictionary relied upon by Digital, sidled means "to move sideways or obliquely" or "to edge along furtively." See Sidle, Dictionary.com, http://www.dictionary.com/browse/approach?s=t (last visited Aug. 4, 2017). The record, however, is bereft of any evidence that Sagitec sidled up to FNPF. Digital does not argue that any of following definitions of the term "approach" apply in the context of the non-solicitation provision: "to come near to in quality, character, time, or condition; to come within range for comparison," "to make advances to; address," and "to bring near to something." See Approach, Dictionary.com, http://www.dictionary.com/browse/approach?s=t (last visited Aug. 4, 2017).

Digital relies on another definition of "approach" listed in the internet dictionary: "to begin work on; set about." See Approach, supra.[11] Digital argues this definition requires that we interpret the non-solicitation covenant to mean that FNPF was "not to even begin being worked on" by Sagitec. Digital contends application of this definition creates an ambiguity in the language of the non-solicitation covenant that should have been resolved in its favor because if "approach" had the same meaning as "solicitation," there would have been no need for the parties to prohibit both forms of conduct.

"An ambiguity in a contract exists" only if the terms are "susceptible to at least two reasonable alternative interpretations." Schor, supra, 357 N.J. Super. at 191 (emphasis added) (quoting Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997)). "The parties' differing subjective interpretations, however, will not rise to the level of ambiguity if the contract is otherwise clear." Hess Corp. v. ENI Petroleum US, LLC, 435 N.J. Super. 39, 46-47 (App. Div. 2014).

---

[11] The online definition Digital relies upon is consistent with other publications recognizing similar, multiple meanings of the word "approach." See, e.g., Oxford Am. Dictionary & Thesaurus, 36 (3d ed. 2010) ("come near to," "go to someone with a proposal or request," "deal with something in a certain way," "a way of dealing with something," "a proposal or request," "the action of approaching, and "a way leading to a place").

We find Digital's proffered interpretation of "approach," as used in the non-solicitation covenant, to mean that Sagitec could not "begin work on" or "set about" FNPF to be illogical. Digital's argument constitutes a strained attempt to create an ambiguity or otherwise expand the scope of the contract. Our task is not to "torture the language of [a contract] to create ambiguity." Schor, supra, 357 N.J. Super. at 191 (quoting Nester, supra, 301 N.J. Super. at 210). Rather, we look to the plain terms of the contract and declare the meaning of what is already written, not what, in hindsight, may have been written. See Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001) (explaining that a court's task is not to rewrite a contract for the parties better than or different from the one they wrote for themselves).

"A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." Hardy, supra, 198 N.J. at 103 (emphasis added). Here, common sense dictates our conclusion that the plain language of the non-solicitation covenant prohibited Sagitec from taking affirmative steps to solicit FNPF's business or approach FNPF to obtain its business. Had Digital intended the non-solicitation covenant to also bar Sagitec from accepting any unsolicited opportunity to work with Digital's clients, it could have expressed such an intention in an obvious manner, with words commonly used to

23

articulate broader restrictions such as those observed, for example, in the context of non-compete agreements. See, e.g., Lamorte Burns & Co. v. Walters, 167 N.J. 285, 292 (2001) (interpreting a restrictive covenant that prohibited employees from "solicit[ing] or accept[ing]" any business relationship with former employer's clients).

The plain and ordinary meaning of the terms in the non-solicitation covenant are unaccompanied by any qualifying terms expanding the scope of prohibited conduct beyond an affirmative act to solicit or approach initiated by one of the parties. It is not our place, as Digital would have it, to "remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div.), certif. denied, 127 N.J. 548 (1991).[12]

Applying the ordinary meanings of the terms in the logical context of the Agreement, we find no ambiguity. Of course, even if we accepted Digital's position that the term "approach," as used in the non-solicitation covenant was ambiguous, such

---

[12] We further note that in any event, even if we adopted Digital's expanded reading of the non-solicitation covenant, there is no evidence Sagitec "worked on" or "set about" FNPF to obtain its request for Sagitec to provide the services.

ambiguity would be resolved against Digital because it drafted the non-solicitation covenant. Roach, supra, 228 N.J. at 174 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

Against this backdrop, the trial court correctly observed that the undisputed facts in the record showed Sagitec neither solicited nor approached FNPF following the rejection of the parties' joint proposal. On October 9, 2013, FNPF emailed the parties with an attached correspondence advising them "that [the joint proposal] has been unsuccessful," and no other tenderer was successful. Sagitec's only subsequent affirmative communication to FNPF in the record is a responding email from Piyush Jain of Sagitec, simply stating the company was "disappointed with the outcome" and thanking FNPF for its consideration.

Four days later, on October 13, 2013, Sagitec received unsolicited correspondence from FNPF concerning a separate potential contract to provide services. The undisputed facts show that Sagitec merely responded to FNPF's request, which was neither solicited by Sagitec nor the result of any approach made by Sagitec. The court correctly determined that Digital failed to produce any evidence to the contrary, and properly dismissed Digital's claim that Sagitec violated the non-solicitation provision.

A-0619-15T3

Digital also claims the court erred by granting Sagitec's motion for summary judgment and dismissing Digital's claims for breach of the covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with prospective economic advantage and for equitable relief. We have carefully considered Digital's arguments, find they are without sufficient merit to warrant discussion in a written opinion, R. 2:10-11(3)(E)(3), and affirm substantially for the reasons set forth in the motion court's comprehensive and well-reasoned written decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-0619-15T3