**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2744-20
      A-3442-21

PETER H. MEISTER, Legal
Guardian for MARIA MOSER
MEISTER, and PETER H.
MEISTER, individually,

   Plaintiffs,

v.

VERIZON NEW JERSEY,
INC., PSE&G SERVICES
CORPORATION, and NEPTUNE
HOLDING US CORP.  d/b/a
ALTICE USA NJ TRANSIT
CORPORATION,

   Defendants.

_____

KIRSCH GELBAND &
STONE, PA,

   Plaintiff-Appellant/
   Cross-Respondent,

v.

DAVID MAZIE and MAZIE

SLATER KATZ & FREEMAN, LLC,

       Defendants-Respondents/
       Cross-Appellants,

and

PHILIP ROSENBACH,

       Defendant/Intervenor
       -Respondent.
_____

Argued January 23, 2024 – Decided June 19, 2025

Before Judges Sumners and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-4738-17 and Morris County, Docket No. L-0838-21.

Bruce H. Nagel argued the cause for appellant Kirsch, Gelband and Stone, PA (Nagel Rice, LLP, attorneys; Bruce H. Nagel, of counsel and on the briefs).

David Mazie argued the cause for respondents/cross-appellants (Mazie Slater Katz & Freeman, LLC, attorneys; David Mazie, of counsel and on the briefs; David M. Freeman and David M. Estes, on the briefs).

Thomas E. Maloney, Jr., argued the cause for respondent Philip Rosenbach.

The opinion of the court was delivered by

SMITH, J.A.D.

These back-to-back appeals involve competing claims by three law firms to a $25,000,000 enhanced contingency fee award following plaintiff's settlement of a personal injury lawsuit for $125,000,000.

In Docket No. A-2744-20, appellant Kirsch, Gelband & Stone, P.A. (KGS), contends that the trial court erred in declining to hold a jury trial on its quantum meruit claim and awarding KGS forty percent ($10,048,708) of the fee award for services rendered prior to withdrawing as plaintiff's counsel. Cross-appellant Mazie Slater Katz & Freeman, LLC (MSKF), successor counsel for plaintiffs in the underlying matter, argues that the trial court erred in awarding it sixty percent ($15,073,062) of the fee award. The trial court found that KGS had not forfeited its fee, and that it was entitled to more than reimbursement for hours spent at a reasonable rate.

In Docket No. A-3442-21, appellant KGS contends that a second trial court erred in dismissing its claims against respondents MSKF and Philip Rosenbach, the referring attorney in the underlying personal injury lawsuit. In that claim, KGS challenged an agreement between Rosenbach and MSKF where Rosenbach assigned his one-third referral fee to MSKF prior to the outcome of the fee split litigation in return for an undisclosed sum.

In Docket No. A-2744-20, we reverse in part the court's order and remand for trial on the fee split. In Docket No. A-3442-21, we affirm the second trial court's order in its entirety.

I.

We glean the facts from the extensive record. On January 23, 2017, forty-six-year-old Maria Meister (Maria),[1] employed as general counsel to a New York-based company, was walking in North Bergen to catch a bus to work when a section of a rotted telephone pole no longer in service fell on top of her. She was rendered unconscious and catastrophically injured. Her many injuries included a skull fracture, bilateral jaw fractures, multiple fractured ribs, multiple fractured vertebrae, a brain injury, swelling of her spinal cord, debilitating nerve damage to her left arm, and two collapsed lungs. As a result of the accident, Maria was left: permanently paralyzed from the breastbone down with no bowel or bladder control and only one functional arm; disfigured on the left side of her face, with facial numbness, partial left eyelid closure and bilateral optic neuropathy with visual disturbance; and with a permanent brain injury resulting

---

[1] We refer to Maria Meister and her husband Peter Meister by their first names for the sake of clarity. We intend no disrespect.

in global neuro-cognitive dysfunction, memory deficits, personality changes, and persistent depressive disorder.

Maria's husband, Peter Meister, consulted with attorney and family friend Philip Rosenbach of Berman Rosenbach, P.C. (Rosenbach), about suing on behalf of Maria. Rosenbach referred the matter to certified civil trial attorney Gregg Stone of KGS. On February 2, 2017, Peter formally retained Stone. In accordance with Rule 1:21-7(a), Stone's retainer agreement stated in pertinent part:

> [T]he client and attorney agree that the attorney shall be paid based on contingency fee. The contingency fee is to be computed as follows.
>
> (a) 33 1/3% on the first $750,000 recovered;
> (b) 30% on the next $750,000 recovered;
> (c) 25% on the next $750,000 recovered;
> (d) 20% on the next $750,000 recovered;
>
> (e) Where the amount recovered is for the benefit of an infant or incompetent and the matter is settled prior to jury selection, the foregoing limits shall apply except that the fee on any amount recovered shall not exceed 25%. In the event the case proceeds to trial and jury is selected the 25% limitation shall not apply.
>
> (f) It is understood that the attorney has the right to, and will apply to the court for a fee on any amount recovered by way of verdict or settlement in excess of $3,000,000.

5

Following his retention, Stone thanked Rosenbach in an email, noting that "[a]t the successful conclusion of the matter, we will forward you a 1/3 referral fee."

On June 30, 2017, Peter, individually and as legal guardian for Maria, sued Verizon New Jersey, Inc. (Verizon), PSE&G Services Corporation (PSE&G), and Neptune Holding US Corp. d/b/a Altice (Altice), seeking compensatory and punitive damages for the injuries sustained by Maria.[2]

To prepare their case, Stone and his associate, Ron Morgan, inspected the defective pole, conducted discovery, performed research, retained numerous experts, gathered medical records and reports, and secured a "life video" of Maria and her family, among other things. They reviewed over 94,000 Verizon documents and took depositions of key Verizon personnel. They also requested the appointment of a special adjudicator[3] to review hundreds of additional documents which Verizon identified as work-product and privileged.

---

[2] Although the complaint also named "N.J. Transit Corporation" as a defendant, it was dismissed from the case early on.

[3] "By order dated April 5, 2024, the term 'Special Master'" in the Rules was replaced by "Special Adjudicator. A [c]onforming rule amendment effective May 2024 followed." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:41-1 to - 5 (2025).

A-2744-20

As a result of his investigation, Stone learned that what he had theorized was simply a failure on Verizon's part to inspect, maintain and remove Maria's pole, which had been in the ground since 1973, was really "company-wide willful and wanton disregard for the safety of New Jersey's residents." The discovery revealed over one hundred key documents, which showed:

> a. Verizon originally scheduled the defective pole to be removed in 1999;
>
> b. Verizon repeatedly postponed the defective pole's removal date;
>
> c. Verizon failed to remove thousands of its New Jersey poles on schedule;
>
> d. Verizon labeled municipalities which threatened fines against Verizon for failing to remove poles as "Hot Towns." Those towns received removal priority over those towns that did not threaten fines. [The latter group] included Maria's hometown of North Bergen, NJ . . . ;
>
> e. Verizon intentionally failed to inspect the subject pole for its remaining life expectancy after 1999, knowing the pole was never removed;
>
> f. Verizon failed to keep up with Board of Public Utility-mandated wood utility pole inspection requirements in New Jersey;
>
> g. Verizon intentionally cancelled its wood utility pole inspection program in 2013 for budgetary reasons;

h. Verizon deliberately concealed its failures to inspect and remove wood utility poles from the Board of Public Utilities; and

i. Verizon management, including New Jersey's regional president, was aware of Verizon's failures and failed to correct them prior to Maria's incident.

The record shows that Stone believed, based on discovery his firm conducted, that plaintiffs' punitive damage claim was the main impetus for the litigation.[4] Settlement negotiations began in July 2018 when Verizon made plaintiffs an initial offer to settle the case for $25,000,000 in compensatory damages. Stone and Peter rejected the offer, as Peter demanded $350,000,000 to settle.

Soon after, Stone learned that a Verizon manager responsible for company telephone poles perjured himself during depositions, falsely claiming that Verizon was meeting its pole inspection requirements in New Jersey. Verizon fired the manager and stipulated, for purposes of the punitive damages claim, that its net worth was more than $5,000,000,000.

---

[4] The record also shows that Peter wanted to stop the "practice of payoffs and profits over people" by securing a huge punitive damages award. Peter additionally wanted to press the Legislature for the amendment of the punitive damages statute to eliminate the cap.

A-2744-20

Stone and Verizon representatives participated in mediations on June 4 and June 24, 2019. Prior to the first mediation on June 4, Stone wrote to Peter confirming that punitive damages were taxable. Concerned about Maria's net recovery, Peter pressed Stone to commit to a specific enhanced contingent fee, noting that the retainer agreement did not specify a cap on enhanced fees. On June 24, Peter presented Stone with a revised retainer agreement which modified paragraph (f) of the original agreement and left blanks for Stone. Stone filled in the blanks by hand as follows:

> (f) It is understood that the attorney has the right to, and will apply to the court for a fee on any amount recovered by way of verdict or settlement in excess of $3,000,000. During the term of "before trial", attorney agrees that the percentage of the amount applied for will not exceed "30%" of the amount recovered.

Other events took place on that day. While the mediation with Verizon continued, Stone negotiated a settlement with PSE&G for $250,000. Peter signed the settlement authorization, but he then refused to sign the release forwarded by PSE&G, citing the unresolved contingent fee issue with Stone.

After a third round of mediation on July 24, Verizon increased its settlement offer to $90,000,000. With Peter's approval, Stone lowered plaintiffs' demand to $210,000,000. Peter acknowledged in writing to Stone that he would accept a $150,000,000 settlement.

9

The record shows Stone understood that the "end game" was a settlement of $125,000,000 to $150,000,000. Because he believed that any settlement would be allocated between compensatory and punitive damages and was concerned about adverse federal tax consequences, Stone asked the mediator to issue an advisory opinion on an appropriate allocation. Peter, who believed that any forthcoming settlement proceeds should not incur tax liability, consulted various tax professionals, trust lawyers, and financial advisors. Emphasizing that he had lowered his settlement demand, Peter unsuccessfully pressed Stone to agree to a lower percentage in his prospective enhanced fee application.

During this period, the relationship between Stone and Peter began to deteriorate. After the first mediation on June 4, Peter accused Stone of not caring about Maria, attacked Morgan, "fired" Stone, and threatened to retain another attorney to handle the June 24, 2019 mediation in a series of profanity-laced emails. In a July 29, 2019 email regarding the unsigned PSE&G release, Peter informed Stone that the "court application for your fees may not exceed 20%, which is a very handsome figure."

On July 30, 2019, the record shows Peter reached out to MSKF and spoke with Adam Epstein, an attorney at the firm. According to Epstein, Peter asked general questions, explained that he was looking to "bolster his team," and

eventually revealed Verizon's $90,000,000 settlement offer. Via email, Peter

and Epstein scheduled a conference call for the following day with MSKF

partners David Mazie and David Freeman. In his response to the scheduling

email, Peter emphasized his unhappiness with Stone's intention to apply for a

thirty percent enhanced fee.

On July 31, 2019, at 7:50 a.m., Stone emailed Peter, stating:

> On 6-24-19, you agreed to settle Maria's case against Verizon for $150 million, with the attorney's fee not to exceed 30%. At the conclusion of the case, I will apply to the [c]ourt, upon written notice to you, for an enhanced and reasonable attorney's fee of 30%. You have the right to appear before the judge and argue why my work effort merits less than the 30% requested attorney's fee. This will confirm our 4 p.m. telephone conference at which time you will need to decide whether to continue the negotiations towards reaching the agreed-upon settlement number of $150 million, if offered, or continue towards trial. Also, please return the executed and notarized [r]elease form PSEG in the amount of $250,000, an amount to which you agreed. Failure to return the [r]elease will result in defense counsel for PSEG filing a [m]otion in court . . . enforcing the settlement.

Two hours later, Peter responded with multiple emails which: informed

Stone that he would not authorize settlement at $150 million unless the

settlement amount was designated as 100% compensatory; instructed Stone to

forward him KGS's hours billed on the file; accused Stone of acting unethically;

11 A-2744-20

informed Stone that he would not accept the $250,000 offer from PSE&G; instructed Stone to prepare a new release from PSE&G; and informed Stone that Peter had "identified an attorney to represent the Meister family."

On Monday, August 5, 2019, Stone advised Peter that PSE&G planned to file an enforcement motion unless the executed release was received by Friday. Peter responded to Stone with another series of emails, stating, among other things, that he would not sign the PSE&G release until Stone reduced his contingent fee and that Dave Mazie would be lead counsel at trial. Stone replied, stating:

> As I previously advised on numerous occasions, the [c]ourt will set my attorney's fee. You will have the right to contest any fee request that I make in [c]ourt. If the case settles (regardless of the amount), prior to empaneling a jury, I will reduce my fee request to 25%, assuming [BR] agrees to reduce his referral fee to the same percentage. [BR's] dollar for dollar reduction from his referral fee will go to Maria, not my firm.

Peter replied with a lengthy email, which stated in relevant part:

> Summary:
>
> 1. 25% cap, it turns out, is the law
> 2. Attorney compensation should be around 5%
> 3. No more verbal agreements.
>
> Phil, you have to agree to the 25% because, according to Adam Epstein of Mazie Slater, "that's the law when

12

the suit is filed on behalf of an incompetent. It's in our own agreement."

. . . .

I will sign PSE&G at 20% cap on attorney fee. I remind you that that is $30 million from a $150 million settlement.

. . . .

In the future, if there is one for us, [h]ere's the new rule between us:

Counsel will refrain from asking . . . me to agree, or for my permission or signature on any deal until the ENTIRE written agreement, that forms the basis for ANY transaction, with complete terms reviewed and agreed to, is in front of me.

When I have an agreement from PSEG in front of me that I actually agree to, I will sign. NO VERBAL AGREEMENTS.

You have my redline.

. . . .

Phil please correct the agreement with PSEG per my redline.

[(Emphasis omitted).]

Stone replied via email:

Calling my impeccable character into question is unacceptable. To reiterate, our Court Rules permit an attorney to ask for an enhanced fee (above that

13

mentioned in the Retainer Agreement) in certain circumstances, such as this punitive damage litigation. As previously advised, it has been my intention to ask for an enhanced fee on all monies received in excess of $3,000,000.

Peter's venomous emails, beginning several days after the June 4, 2019[,] mediation, are inexcusable and have caused a complete and total deterioration of the lawyer-client relationship. Even prior to June 4, 2019, Peter's incessant emails at all hours of the night showed no boundary or respect for myself and my family.

For these and a myriad of other reasons that need not be discussed, I am submitting my resignation as your counsel, effective immediately. I will file a [m]otion with the [c]ourt to be relieved as your counsel[] and protect my advanced costs and attorneys' fees on all monies received.

I wish Maria and your entire family the best. Please do not make any further contact with me. Kindly have your new lawyer request the file.

That same night, Peter emailed Epstein, advising that he and Maria wanted to see him as soon as possible because "Gregg Stone quit when I called him out on the 25%." Peter, Maria, Epstein, Mazie, and Freeman met the next day at MSKF's offices, and on August 9, 2019, Peter formally retained MSKF, with MSKF agreeing to accept an enhanced fee of no more than twenty percent.

On September 13, 2019, Rosenbach emailed Stone to advise that he had nothing to do with substitute counsel. Rosenbach stated:

14

For my peace of mind, please confirm my continuing participation in your fee. If you end up in litigation with Mazie regarding the fee, I'm certainly willing to provide assistance on any legal papers that need to be filed. And, of course, if there are costs associated with that litigation, I will share on a percentage basis.

On August 6, 2019, KGS filed a motion to be relieved as counsel. KGS also asserted an attorney's lien on any monies recovered in the Meister action. KGS requested to be heard in MSKF's fee application when the Meister case was settled. In a supporting certification, Stone stated, in pertinent part, that:

9. Within several days following the June 4, 2019 mediation, the lawyer-client relationship between the undersigned and Peter Meister progressively deteriorated and became irreversibly strained. Without going into specifics, Peter Meister has incessantly used ultimatums and non-physical threats against the undersigned and his firm.

10. Apart from the settlement with Verizon . . . defendant PSE&G has offered to settle its portion of the case.

11. On June 24, 2019, Peter Meister provided written authorization to [KGS] authorizing the settlement with PSE&G.

12. Notwithstanding, Peter Meister refuses to execute the PSE&G Release.

13. Given the complete and utter breakdown in the lawyer-client relationship between the undersigned and Peter Meister, [KGS] has no alternative but to seek to be relieved as counsel in this matter.

15

During the withdrawal hearing, Stone conferenced[5] with Mazie and the motion judge to discuss his reasons for withdrawing. According to Stone, one reason was Peter's new demand for an all-compensatory damage settlement. Stone acknowledged that he omitted this reason in both his email to Peter and his withdrawal certification so as not to adversely impact Peter's settlement posture with Verizon. Stone believed that such a settlement would constitute tax fraud. At the hearing, Mazie stated on the record multiple times that KGS could pursue a claim for quantum meruit.

The judge granted KGS's motion for withdrawal but rejected Stone's request to participate in MSKF's eventual fee application. The motion judge stated:

> [r]egardless of the availability of [a] N.J.S.A. 2A:13-5 lien, the theory of quantum meruit, which Mazie has suggested is the appropriate remedy herein, is a viable alternative and one the court believes will eventually be the most appropriate means to ensure that Stone is fairly compensated from the attorneys' share of the client's recovery.

The judge noted that KGS's claim for costs in the amount of $84,241.13 had been satisfied by Mazie.

---

[5] According to the parties, the conference was not on the record.

On February 14, 2020, Peter settled his claims against Verizon for $125,000,000, with no punitive damage component. On March 6, 2020, Rosenbach wrote to Stone to confirm their referral fee arrangement. Stone wrote in response, "I acknowledge that you are owed a referral fee from the attorney's fee allocated to my firm. When the fee issue with Mazie resolves, I'll notify you." Rosenbach responded, thanking Stone and stating, "I have previously offered to provide assistance if you end up having a fight with Mazie. That offer is still on the table."

On May 4, 2020, during a friendly hearing in Essex County to approve the Verizon, PSE&G and Altice ($25,000) settlements, Mazie submitted a certification that also encompassed a fee application. The fee application included KGS's work product and a request for reimbursement of disbursements totaling $216,180.24, including Stone's costs. In that certification, Mazie noted that, when discounted to present value, Maria's past and future lost wage claims totaled $5,479,822, while her past and future medical and other care expenses and health insurance totaled $15,771,353. Mazie informed the motion judge that the parties sought a ruling that the entire Verizon settlement was compensatory.

Mazie stated:

> [T]here were claims for punitive damages in this case. I would ask Your Honor to make an independent

finding – and we believe this to be the case – that the amount of this settlement itself is justifiable for only personal injury and physical damages, that there is no part of this settlement that's been agreed to or that would be apportioned to anything other than personal injury and physical damages and that there would be no – none of the settlement [is for] punitive damages at all.

The friendly hearing judge, who also heard KGS's motion to withdraw, found:

> There's nothing in the record to indicate that punitive damages were a component of this settlement . . . . [T]here would be no basis upon which the [c]ourt could conclude that the sum at issue includes in any amount punitive damages or a punitive damages contemplation.
>
> . . . .
>
> I certainly cannot know . . . [what] the decision makers were thinking when they agreed to settle the case for the sum at issue, there's nothing in the record to suggest that punitive damages don't play – were in play in negotiations, nothing explicit or complicit.
>
> . . . .
>
> This plaintiff was a victim of a tragic accident. She suffered cataclysmic and catastrophic injuries and, as a result, the enormity of the settlement has to be viewed in the context of those injuries and, as such, while a substantial figure, it appears to be, at least in this [c]ourt's estimation, perfectly appropriate given what it is that was suffered by Mrs. Meister[.]

At end of the friendly hearing, the judge approved the settlements and entered an order of judgment against Verizon, PSE&G, and Altice. It allocated $118,275,000 of the Verizon settlement to Maria, and $7,000,000 to Peter for his per quod claim. It also awarded attorney's fees of twenty percent on the excess of $3,000,000 or $25,000,000, with the monies to be held in escrow pending resolution of KGS's lien.

On May 5, 2020, Mazie informed Stone that he had forfeited his fee and would not share in the $25,000,000 award.

On May 6, 2020, KGS filed a two-count complaint in Essex County under Docket No. L-3110-20 seeking a division of the fee award pursuant to N.J.S.A. 2A:13-5, damages for tortious interference in the transfer of the Meister file to MSKF, and a jury trial. The KGS suit was consolidated with the Meister action.

On May 13, 2020, MSKF moved under the Meister docket to enjoin KGS's complaint, discharge KGS's lien, and distribute the entire $25,000,000 fee award to them. MSKF argued that Stone's withdrawal related only to fees, therefore he was not entitled to any fee. KGS opposed, with Stone certifying that he:

> worked with [Peter] without material controversy or difficulty until early June 2019 when his behavior became threatening and abusive, accusing my firm of unethical conduct and requesting that we engage in potentially unethical and criminal conduct to shield him from paying any taxes on the punitive damage[] aspect

19

of the case. When I moved to be relieved as counsel, I had been constructively discharged and I also had good and just cause to withdraw under R.P.C. 11.6(b).

The trial court heard argument, then denied MSKF's motion to enjoin KGS's complaint, discharge the lien, and pay the entire fee to MSKF. It granted MSKF's motion to dismiss with prejudice the KGS count seeking a division of fees and denied KGS's motion to transfer the case to another judge. The court found there was an issue of fact concerning whether Stone withdrew with justifiable cause from the <u>Meister</u> matter, and it denied the application to discharge the lien. The court noted that, if KGS was correct that Stone was constructively discharged because of Peter's allegations against him, then Stone would be entitled to recover under a quantum meruit theory. If, however, MSKF was correct that Stone's withdrawal was simply due to irreconcilable differences over Stone's fee, MSKF would get the entire fee.

The court also denied MSKF's request to enjoin the KGS's complaint, stating:

> Mr. Mazie's request to enjoin the related action is also denied. However, the court agrees with his argument that the dispute over the fee is best resolved in the underlying action, <u>Meister v. Verizon</u>. Although KGS is correct that <u>H. & H. Ranch Homes, Inc. v. Smith</u>, 54 N.J. Super. 347 (App. Div. 1959) <u>H. & H.</u> and N.J.S.A. 2A:13-5 contain only permissive language, the [c]ourt holds that the lien is best resolved in the action where

20

the application was made. It should also be noted that the [c]ourt has consolidated the two matters.

Thus, the [c]ourt holds that a plenary hearing in the underlying matter is required. Therein, the [c]ourt will undertake the fact-finding process of determining whether Mr. Stone withdrew with justifiable cause. If the [c]ourt finds he did not, then the issue is resolved, and the lien and quantum meruit claims are moot. However, if the [c]ourt finds in the affirmative, the [c]ourt will hear testimony as to the lien and quantum meruit claims to determine the appropriate recovery.

With that being said, as the dispute progresses, the [c]ourt bears in mind two things. First, the record shows that prior to Mr. Stone's withdrawal, Mr. Meister sent an email to Mr. Stone labeled "thin ice," wherein he questioned whether Mr. Stone was acting in good faith. He also mentions the conversation he had with Mazie Slater about the permissible percentage of attorney's fees. Using that information – information already included in the retainer agreement – he questions whether Mr. Stone was acting ethically. As stated, in other jurisdictions, a client's allegations that his attorney is being dishonest amount to justifiable cause. See Mutter v. Burgess, 290 P.2d 269, 270 (1930).

In his opinion on the motion to withdraw, [the motion judge] held that quantum meruit "is a viable alternative and one that the court believes will eventually be the most appropriate means to ensure that [Mr. Stone] is fairly compensated from the attorneys' share of the client's recovery." Additionally, he specifically referenced that Mr. Mazie's opposition papers suggested quantum meruit "is the most appropriate remedy." Yet, before [this] court is Mr. Mazie's motion to completely discharge the lien.

21

> Count One of KGS's complaint is dismissed, because
> the fee issue will be resolved in the underlying matter.

The court directed KGS to file an amended count two, pleading with more specificity the alleged improper means MSKF used to lure Peter away from Stone.

In July 2020, over KGS's objection, MSKF asked the court to approve a "settlement" between it and BR, and to release $8,300,000 to it, representing one-third of the entire escrowed fee award. The trial court denied the motion without prejudice as premature since KGS's entitlement to a fee was contested and unresolved. It stated that MSKF could move for court approval of the settlement and referral fee following the "plenary hearing," provided KGS succeeded on its claims. The parties sought reconsideration as both sides wanted the court to resolve the legality of Rosenbach's assignment. However, the court found the issue premature. It was not willing to approve an agreement that might enable MSKF to collect more money than that to which Rosenbach was entitled. On August 12, 2020, KGS filed an amended count two, the tortious interference claim. MSKF's motion to dismiss the amended count was unsuccessful.

Prior to trial, the court issued a case management order. Among other things, the order: stayed the KGS suit pending resolution of the <u>Meister v. Verizon</u> fee dispute; limited discovery to the production of emails between Peter

22

and MSKF between July 25 and August 6, 2019; barred expert testimony; and listed the trial as a non-jury matter.

The dispute was tried in February 2021. Stone testified that his firm had spent more than 3,300 hours working on the <u>Meister</u> matter over the course of two and one-half years. This included document review, meetings, depositions, and motions. Stone noted that, as his firm did not keep time records, his tallies were approximations and likely underestimated the actual time spent. Stone testified that, while Peter never expressly said that he wanted to commit tax fraud, he believed Peter was suggesting this through his email and that this was one reason he withdrew from the case. Stone believed that an allocation was necessary because punitive damages were the main driving force in the litigation. Stone admitted that a mere dispute over fees would not justify withdrawal, and he acknowledged that he did not use the term "tax fraud" when he and Mazie spoke privately with the motion judge.

Stone maintained that, when he withdrew in August 2019, the case was substantially complete, apart from updating medicals, and that he was ready for a possible trial in January 2020. Stone testified that most of the subsequent work performed by MSKF was unnecessary.

Epstein testified that he never advised Peter that Stone could not ask for more than twenty-five percent in his enhanced fee application. He also admitted that: MSKF did not get a significant portion of the Verizon documents until late January 2020; he did not locate any other documents relevant to the punitive damages issue that were missed by Stone; MSKF relied upon the punitive damages claim to drive the settlements negotiations; as of November 8, 2019, Verizon's offer had increased to $105,000,000 without the taking of any new depositions; and on December 24, 2019, Verizon's offer increased to $110,000,000.

Mazie testified that there was still a great deal of work to be done when he took over the case, and that his firm billed over 900 hours after MSKF took over. Specifically, MSKF: secured additional and updated expert reports; prepared a mediation video and a "day-in-the-life" video; hired a new life care expert who succeeded in adding more than $4,000,000 to Maria's life care plan; and defended twelve depositions.

According to Mazie, Stone did not discuss potential illegality during the private conference, but simply explained that he was hurt and insulted by Peter's emails. Mazie admitted that he never claimed that Stone forfeited his fee until after the Meister fee award decision.

On April 18, 2021, KGS filed a new complaint in Morris County against Mazie, MSKF and Rosenbach, and amended it in July 2021. The new complaint alleged four theories.

First, KGS alleged that MSKF's purchase of Rosenbach's referral fee after KGS filed its complaint against MSKF for a portion of the Meister fees violated public policy and "other standards governing attorneys and referral fees" because it amounted to the purchase of a derivative interest in the cause of action against MSKF.

Next, KGS alleged that Rosenbach was not entitled to a referral fee because: he violated his fiduciary duty and duty of loyalty to KGS, as well as the implied covenant of good faith and fair dealing when, as "co-venturer and co-counsel" in the Meister matter, had subsequently agreed to "support KGS in the [fee share] litigation," he adversely affected KGS's rights and otherwise harmed KGS by selling his referral fee to a party adverse to KGS; and the agreement to pay Rosenbach the referral fee was "contingent upon a successful completion of the Meister matter, which condition was not met because of both the substitution of MSKF and the need to litigate the fee claim against" MSKF and Mazie. KGS alternately alleged that any referral fee due Rosenbach should

25                                                                        A-2744-20

be based upon the amount of fees that KGS received net of fees and costs it incurred while litigating its right to the fee award in the Meister matter.

In count three, KGS alleged that MSKF and Mazie engaged in wrongful conduct "done for improper ulterior purposes" and "made an improper, illegal and perverted use of legal procedure" when it:  relied upon KGS's work product in its Meister fee application; subsequently took the position that KGS, and thus Rosenbach, were not entitled to any share in the fee award; purchased Rosenbach's claim to a referral fee regardless of its foregoing stance; and filed a motion seeking to pay itself of a full one-third of the Meister fee award, i.e., $8,300,000, by virtue of its assignment agreement with Rosenbach.

In count four, KGS alleged that defendants' referral fee purchase was done "intentionally, willfully, and maliciously to, among other reasons, obtain improper advantage over KGS in the litigation, and to hamper and impede KGS's ability to litigate and/or settle the case."

KGS sought  a declaration that: the referral fee assignment from Rosenbach to MSKF was null and void; Rosenbach was not entitled to a referral fee; alternatively, any fee to Rosenbach would be net of KGS's litigation fees and costs to obtain a portion of the fees in the Meister matter; and damages,

punitive damages, interest, attorney's fees and costs of suit. KGS also demanded a jury trial in Morris County.

On May 14, 2021, the Essex County trial court granted Rosenbach's motion to intervene on the referral fee issue. The court also granted MSKF's motion to enforce the referral agreement and compel the disbursement of Rosenbach's $3,300,000 referral fee. That same day, the trial court granted KGS's motion to deconsolidate and release the stay on KGS's now-single-count tortious interference complaint. The court denied MSKF's motion to transfer the Morris County action and consolidate it with the Essex County action.

KGS appealed in the <u>Meister</u> matter, and MSKF cross-appealed.[6] KGS next appealed the Morris County motion court's dismissal with prejudice of its second complaint in August 2021.

In the <u>Essex</u> appeal,[7] KGS contends that the trial court erred by: dismissing the fee-splitting count and then issuing a case management order establishing a summary-like proceeding that improperly limited discovery and

---

[6] On January 10, 2023, we ordered that the two appeals be heard back-to-back. We then reserved on KSG's motion in A-3442-21 to strike portions of Mazie/MSKF's supplemental appendix, directing that the motion would be reviewed by the panel hearing the appeal.

[7] A-2744-20.

barred a jury trial; making insufficient findings of fact and conclusions of law after the proceeding; failing to properly apply the proper standard for division of the disputed fee; and improperly granting MSKF's motion to pay the referral fee to Rosenbach. For the first time on appeal, KGS also contends that the Essex trial court should have invalidated MSKF's purchase of the Rosenbach referral fee claim.

On MSKF's cross-appeal, they contend the trial court erred by: finding Stone had just cause to withdraw and did not forfeit his fee; and finding that KGS's fee recovery was not limited to reimbursement for hours spent at a reasonable rate.

In KGS' Morris County appeal,[8] it argues that the trial court erred by: dismissing the complaint on collateral estoppel grounds; finding that KGS lacked standing to litigate the validity of the agreement between MSKF and Rosenbach; and finding that KGS failed to adequately plead its claims, including its claim that Rosenbach was not entitled to a referral fee.

---

[8] A-3442-21

A-2744-20

## II.

### A.

The scope of our review of a trial court's fact-finding function is limited. See Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 437 (App. Div. 2016). "[F]actual findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We will 'not disturb the factual findings and legal conclusions of the trial judge unless' convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Matter of Twp. of Bordentown, 471 N.J. Super. 196, 217 (App. Div. 2022), cert. denied, 252 N.J. 533 (2023) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474 (1974)). Indeed, appellate courts give great deference to the trial judge's factual findings and will not "engage in an independent assessment of the evidence as if [we] were the court of first instance . . . ." Bank of N.Y. Mellon v. Corradetti, 466 N.J. Super. 185, 206 (App. Div. 2020) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

We do not defer to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Comprehensive Neurosurgical,

P.C. v. Valley Hosp., 257 N.J. 33, 80 (2024) (quoting Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019)).

III.

A-2744-20

*The Essex County Appeal*

A.

The threshold issue before us is whether the trial court erred in finding that Stone did not forfeit his fee in its entirety when he withdrew from the Meister case. We conclude that the court did not err, and that its findings were grounded in substantial credible evidence in the record.

Generally, an attorney who is retained pursuant to a contingent fee agreement, and who withdraws without justifiable cause prior to the full performance of all required services, forfeits all rights to compensation. Dinter v. Sears, Roebuck & Co., 278 N.J. Super. 521, 532 (App. Div. 1995). The "justifiable cause" exception to the Dinter rule applies in instances where trust and confidentiality no longer exist in the attorney/client relationship or there is an ethical reason requiring withdrawal. Ibid. (citing Int'l Materials v. Sun Corp., 824 S.W.2d 890, 895 (Mo. 1992)). Examples of "justifiable cause" for withdrawal include: (1) the client threatening to commit perjury; (2) the client

accusing the attorney of dishonesty; (3) the client reporting the attorney to the bar disciplinary board; (4) the total breakdown in communication between the attorney and client caused by the client; (5) employment of other counsel by the client with whom the first attorney cannot cordially cooperate; and (6) unforeseeable conflicts of interests arising after the attorney accepts the client's case. Int'l Materials, 824 S.W.2d at 894-95.

Analyzing the justifiable cause issue, the trial court stated:

> A review of the substantive communications between Mr. Stone and Mr. Meister reveals [that] . . . the attorney-client relationship was generally productive. Mr. Meister repeatedly applauds Mr. Stone's efforts in litigating the case. However, it is also clear that Mr. Meister was a fully engaged and passionate client. He would contact Mr. Stone very often at all hours of the night. This resulted in a number of clashes, including Mr. Meister firing, and immediately re-hiring KGS; issuing an ultimatum if a KGS associate participated in the mediation; and demanding his family attorney act as lead counsel during mediation. Further, as the case moved closer to settlement, the subject of Mr. Stone's fees caused a drastic rift in the relationship.

The trial court determined that this was not a simple fee dispute between KGS and Peter. It found a myriad of facts supporting a finding of constructive discharge, including Peter's allegations of dishonesty and threatening behavior, and MSKF's alleged unethical intervention, which entitled Stone to a quantum

31

meruit share of the fee. The trial court found Stone's testimony about his belief that he faced an ethical dilemma over the damages allocation issue credible. Given that punitive damages had driven the case to settlement offers of unprecedented magnitude for a personal injury case with finite costs for care and lost wages, it follows that Stone had an objectively reasonable basis to believe that Peter was placing him on uncertain ethical ground in suddenly demanding that any settlement be entirely compensatory in nature and thus, non-taxable. We therefore reject MSKF's contention on its cross-appeal that Stone should have forfeited his entire fee, and we discern no error by the trial court in finding that KGS was entitled to a share of the Meister fee.

B.

Having concluded that KGS did not forfeit a share of the settlement fee when Stone withdrew, we turn to the merits of the fee split dispute.

KGS first contends that the Essex trial court committed error when it: dismissed count one; denied KGS's right to a jury trial; and curtailed full discovery. We agree.

On July 30, 2020, before commencement of trial, the court heard argument on: MSKF's motion to enjoin KGS's lawsuit, discharge the lien, and pay the entire fee to MSKF; KGS's opposition to the motion; and MSKF's motion to

32

dismiss the suit. The court denied the discharge application, dismissed count one with prejudice, and denied turnover of the entire fee. In its written statement of reasons, the trial court found that the "lien [was] best resolved in the action where the application was made," particularly since the matters were now consolidated. The court stated that it would conduct a plenary hearing and make findings of fact to determine KGS's entitlement to a share in the fee award. The court did not comment upon the jury demand.

At a September 11, 2020 conference, the court informed counsel that the fee split hearing would be a summary proceeding pursuant to Rule 4:67-1 with no discovery. It stated that witnesses would be permitted upon application of the parties, but there would be no depositions. The court stated, "[t]here has been too much time, effort, and money expended in this case. We need to go to the end and do that as expeditiously as possible in the interest of justice."

In response to KGS's argument that full discovery followed by a plenary hearing was required, the trial court replied:

> [L]et me put that question to bed. I don't agree that the court requires a plenary hearing in the manner that you suggest. I will – well, if you request, allow testimony, if that – you can call that a plenary hearing and that satisfies you, then that's fine with me. But, again, this is not going to be a week – you know, this case should be completed – this hearing should be completed in a day. So let's move on. I have made my ruling.

33

The court's order required a "plenary proceeding," but limited discovery to any emails between MSKF and Peter, and it barred expert testimony. The court's order also noted that the referral fee would be decided after the plenary.

N.J.S.A. 2A:13-5, adopted by our Legislature over a century ago, states in pertinent part:

> After the filing of a complaint . . . the attorney . . . who shall appear in the cause for the party instituting the action . . . shall have a lien for compensation upon his client's action . . . which shall contain and attach to a verdict . . . judgment or final order in his client's favor, and the proceeds thereof in whosesoever hands they may come. The lien shall not be affected by any settlement between the parties before or after judgment or final order . . . . <u>The court in which the action or other proceeding is pending, upon the petition of the attorney or counsellor at law, may determine and enforce the lien.</u>

> [(Emphasis added).]

Under N.J.S.A. 2A:13-5, a "complaint" is required to enforce an attorney's lien. <u>Mateo v. Mateo</u>, 281 N.J. Super. 73, 79 (App. Div. 1995); <u>see also</u> <u>Schepesi, McLaughlin, P.A. v. LoFaro</u>, 430 N.J. Super. 437, 357 (App. Div. 2013). A petition or complaint to enforce a lien may be filed prior to the conclusion of the client's underlying action or after the matter has ended by judgment or settlement. <u>Musikoff v. Jay Parrino's the Mint, L.L.C.,</u> 172 N.J.

133, 136 (2002); see also Levine v. Levine, 381 N.J. Super. 1, 9 (App. Div. 2005).  A litigant has a right to trial by jury as to the quantum of fees.  Fuessel v. Cadillac Bar Corp., 63 N.J. Super. 430, 433 (App. Div. 1960).  Although quantum meruit is often described as rooted in equitable principles, it is in fact a legal remedy.  Kopin v. Orange Prod., Inc., 297 N.J. Super. 353, 367 (App. Div. 1997).

We established clear guidelines for practical application of N.J.S.A. 2A:13-5 in H. & H. Ranch Homes, Inc. v. Smith  stating:

> For the guidance of counsel in connection with future applications, consistent with the spirit of our present rules of practice, we suggest that, where the determination or enforcement of an attorney's lien is sought, the following procedure . . . be employed: The attorney should make application to the court, as a step in the proceeding of the main cause, by way of petition, which shall set forth the facts upon which he relies for the determination and enforcement of his alleged lien. The petition shall as well request the court to establish a schedule for further proceedings which shall include time limitations for the filing of an answer by defendants, the completion of pretrial discovery proceedings, the holding of a pretrial conference, and the trial.  The court shall, by order, set a short day upon which it will consider the application for the establishment of a schedule.  A copy of such order together with a copy of the petition, shall be served upon defendants as directed by the court.  The matter should thereafter proceed as a plenary suit and be tried either with or without a jury, in the Law Division, depending upon whether demand therefor has been

35

made[] . . . or without a jury if the venue of the main cause is laid in the Chancery Division. In no event should the matter be tried as a summary proceeding.

[(54 N.J. Super. 347, 353-54 (App. Div. 1959)).]

In its written statement of reasons, the court agreed that KGS was entitled to pursue its claim for quantum meruit in a separate suit. Dismissing count one, it found the fee split dispute would be best resolved "in the action where the application was made." The court informed counsel that it would conduct a bench trial. It did not separately address why KGS was not entitled to a jury trial.

When we read N.J.S.A. 2A:13-5 together with our well-settled jurisprudence, we conclude that the trial court misapplied applicable law. We have clearly stated that, "[i]n no event should [fee splitting litigation] be tried as a summary proceeding." Id. at 354. Given the complex and contentious record here, we easily conclude that reversal for a full trial, consistent with our guidelines in H. & H. Ranch Homes, Inc., is the proper course of action.[9] The trial court shall allow pre-trial discovery, consistent with the law.

---

[9] By our holding we do not constrain our trial courts' discretionary authority to fashion appropriate limits on the scope and conduct of the proceeding mandated here. We simply recognize that summary proceedings are inapposite for

The remaining question is whether KGS is entitled to a jury. MSKF maintains that KGS waived the right to a jury when it failed to demand same within ten days of its motion to withdraw in accordance with Rule 4:35-1(a). We disagree.

"[S]imply moving for an attorney's lien pursuant to N.J.S.A. 2A:13-5, as distinguished from filing a complaint demanding a fee, is not the proper way to establish an attorney's lien." Martin v. Martin, 335 N.J. Super. 212, 223 (App Div. 2000); accord Mateo, 281 N.J. Super. at 79. "The statute itself puts parties on notice that a lien may be claimed, . . . but in the context of a withdrawing attorney who is handing over a file to a client or a substituting attorney, and thereby relinquishing his common law 'general' or 'retaining' lien, we can understand why additional, specific notice of the intent to rely on N.J.S.A. 2A:13-5 is sensible and warranted." Martin, 335 N.J. Super. at 223-24. Such notice can be attached to the written substitution of attorney. Id. at 224.

Neither KGS's withdrawal motion nor the lien references in it can be considered a "petition" to enforce for purposes of N.J.S.A. 2A:13-5, all required information we identified in H. & H. Ranch Homes, Inc. The lien reference

_____

resolving fee disputes under N.J.S.A. 2A:13-5. H. & H. Ranch Homes, Inc., N.J. Super. 347 at 354.

simply put MSKF on notice that KGS intended to pursue its lien at the appropriate time, place, and manner.

KGS filed its two-count complaint in Essex County seeking enforcement of the fee lien after Mazie informed Stone that KGS had waived its fee. KGS followed N.J.S.A. 2A:13-5 and the H. & H. Ranch Homes, Inc. guidelines, and it is entitled to a jury trial.

## C.

Because we find that KGS is entitled to a share of the fee and that there should be full trial to determine the amount of KGS's share, we comment briefly on the legal standards to be employed by the trial court on remand.

KGS contends that the trial court failed to make the requisite findings of fact and conclusions of law, and that it also failed to properly apply La Mantia v. Durst, 234 N.J. Super. 534 (App. Div. 1989) and the Rules of Professional Conduct (RPC) factors in its quantum meruit analysis. We consider the applicable law.

Courts employ the equitable doctrine of quantum meruit, meaning as much as one deserves, to determine counsel fee awards. La Mantia, 234 N.J. Super. at 537; Kas Oriental Rugs, Inc. v. Ellman, 394 N.J. Super. 278, 286 (App. Div. 2007). "Quantum meruit is a form of quasi-contractual recovery and 'rests

on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" Goldberger, Seligsohn & Shinrod, P.A. v. Baumgarten, 378 N.J. Super. 244, 252 (App. Div. 2005) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992)). "Recovery is permitted in quasi-contract because one party has conferred a benefit on the other and, in the circumstances, it would be unjust to deny recovery." Id. at 253.

Application of the doctrine requires a fact-sensitive analysis. La Mantia, 234 N.J. Super. at 537. Although there are no "hard and fast" rules governing the application of quantum meruit, courts should consider the following factors: (1) the length of time each attorney spent on the case in relation to the total amount of professional hours spent to resolve it; (2) the quality of the representation provided; (3) the results achieved by each lawyer's efforts; (4) the reason the client switched representation; (5) the viability of the client's claims at the time of transfer; and (6) the amount of the recovery ultimately realized. Id. at 540-41. Notably, this analysis is not a mathematical exercise; rather "if the predecessor's work, no matter how extensive, contributed little or nothing to the case, then the ceding lawyer should receive little to no compensation." Glick v. Barclays De Zoete Wedd, Inc., 300 N.J. Super. 299, 311 (App. Div. 1997).

Additionally, although not dispositive, the RPC also provide useful guidance for calculating a reasonable attorney's fee award. In particular, RPC 1.5(a) sets forth that the factors to be considered in determining the reasonableness of a fee include:

> (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.

Under Rule 1:7-4, a court is obligated "'to make findings of fact and to state reasons in support of [its] conclusions.'" Giarusso v. Giarusso, 455 N.J. Super. 42, 53 (App. Div. 2019) (quoting Heinl v. Heinl, 287 N.J. Super. 337,

40

347 (App. Div. 1996)). "'Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion.'" Ibid. (quoting Strahan v. Strahan, 402 N.J. Super. 298, 310 (App. Div. 2008)). "'Naked conclusions do not satisfy the purpose of [Rule] 1:7-4.'" Id. at 54 (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)); accord Kas Oriental Rugs, 403 N.J. Super. at 562.

Our review of the voluminous record leads us to conclude that the trial court's findings were incomplete or unsupported in some instances, and in other instances, inconsistent with undisputed evidence. In particular, the court : (1) erroneously found that Mazie had the file for thirteen months rather than nine; (2) did not critically review MSKF's hours claimed, including fee dispute hours MSKF improperly included; (3) erroneously found that both firms bore similar risk in the litigation when KGS had obtained a stipulation of liability from Verizon prior to Mazie taking over the case; (4) made no findings about the reasonableness of MSKF's rates, as MSKF refused to provide this information; (5) found equipoise for many of the factors, which seemed to contradict its allocation in Mazie's favor; (6) failed to reduce hours for wasteful, unnecessary, and duplicative work; (7) did not credit KGS for the status and viability of the case at the time Stone withdrew; (8) did not credit KGS for its work in

41

developing the punitive damages claim; and (9) did not credit KGS for obtaining from Verizon a stipulation to over $5,000,000,000 in net worth.

In short, the court's allocation decision was not rooted in the required application of the facts to the relevant law.  It is clear to us that these issues should be considered with a more fulsome factual record developed on remand. On remand, we call attention to the specific analytical framework outlined here. Accordingly, the trial court's quantum meruit allocation is reversed.

We reject MSKF's contention on cross-appeal that the trial court erred by failing to limit KGS's fee share to hours spent at a reasonable rate.  The trial court reviewed the analytical framework set forth in Glick, 300 N.J. Super. at 311. Glick identifies two guidelines for the fees to which original counsel would be due in certain scenarios:  (1) if the succeeding lawyer received a "substantially prepared case[,]" original counsel might be entitled to "compensation greater than the standard hourly rate[;]" but (2) if the succeeding lawyer was crucial in the success of the case, original counsel should be compensated "at most, upon a standard hourly rate."  Analyzing the facts, the court determined:

> The Glick extremes are useful only in circumstances
> where one applies to the exclusion of the other.  Here,
> the [c]ourt concludes that both factors apply and
> therefore neither extreme (greater [c]ourt or limited to

an hourly rate) applies. In sum, the Court finds having considered the testimony presented, reviewed the substantial documents in evidence and the argument of counsel and briefs submitted, that KGS presented a substantially completed case[,] and that Mazie was crucial in the success of the case.

Having so found, all that needs to be determined is the "quantum" of fees awarded.

We agree with the trial court's sound analysis in this regard, and we reject this element of MSKF's cross-appeal.

IV.

A-3442-21

*The Morris County Appeal*

The Morris County trial court dismissed KGS's complaint challenging the assignment agreement, using alternative theories. It determined that KGS: had no standing to litigate the enforceability of the agreement; failed to state a claim under Rule 4:6-2(e); and, finally, was collaterally estopped from proceeding with its complaint. KGS argues that the trial court committed error in applying each of its three dismissal theories. We are not persuaded and affirm the trial court's order dismissing the complaint.

43

## A.

We review de novo a trial court's decision to dismiss a complaint for lack of standing. NAACP of Camden Cnty. East v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 444 (App. Div. 2011). Standing refers to a litigant's "'ability or entitlement to maintain an action before the court.'" In re Adoption of Baby T., 160 N.J. 332, 340 (1999) (quoting N.J. Citizen Action v. Riviera Motel Corp., 296 N.J. Super. 402, 409 (App. Div. 1997)). A lack of standing by a plaintiff precludes a court form entertaining any of the substantive issues presented for determination. Watkins v. Resorts Int'l Hotel & Casino, 124 N.J. 398, 424 (1991).

Generally, a litigant has standing under the common law when he or she has "a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden Cnty., 170 N.J. 439, 449 (2002). The standing rules, while liberal, Jen Elec., Inc. v. Cnty. of Essex, 197 N.J. 627, 645 (2009), preclude actions initiated by persons who are nothing more than "total strangers or casual interlopers" with respect to the dispute, People For Open Gov't v. Roberts, 397 N.J. Super. 502, 509 (App. Div.

2008). Significantly, a litigant "does not have standing to assert the rights of third parties." Abbot v. Burke, 206 N.J. 332, 371 (2011).

In deciding the standing issue, the trial court rejected KGS's argument that it had standing to assert claims against MSKF and Rosenbach because their actions and improper conduct caused KGS to spend time, effort and money in the Essex County fee split litigation. The court found: KGS had not asserted a legal basis for the recovery of legal fees in an independent action; KGS had no contractual right to recover fees flowing from the assignment because it was not a party to the agreement between Rosenbach and MSKF; and KGS failed to identify any duty MSKF and Rosenbach owed to it as a third party to the assignment agreement. (Citing Baxt v. Liloia, 155 N.J. 190 (1998) for the principle that an attorney's violation of the Rules of Professional Conduct does not give rise to a new cause of action based on that violation, the trial court granted defendants' motion to dismiss KGS's complaint for lack of standing.)

Given the trial court's cogent analysis, our de novo review need not be extensive. The record shows that the assignment agreement was solely between Rosenbach and MSKF. KGS's third-party status leaves it without a sufficient legal or equitable interest in the assignment agreement to establish standing. KGS failed to allege violation of an identifiable public policy or a specific

attorney standard which would alter that outcome.[10]  Neither Rosenbach nor MSKF acquired a proprietary interest in Peter and Maria's underlying personal injury clam.  The transfer only concerned Rosenbach's derivative financial interest in KGS's fee.  While KGS may view Rosenbach's assignment as strategically unfavorable, their dissatisfaction does not rise to the level of actionable harm.

We discern no error by the trial court in dismissing KGS's Morris County complaint.  Because we affirm the trial court's dismissal order on standing grounds, we need not address KGS's other challenges concerning Rule 4:6-2(e) and collateral estoppel.

Our affirmance of the trial court's order affects an element of the Essex County appeal.  In A-2744-20, KGS argued that the trial court erred when it granted MSKF's motion to compel the payment of the referral fee to Rosenbach

---

[10]  Count One, paragraph seven of KGS's Morris County complaint alleges:

> [t]he purchase of the referral fee after the filing of the suit by KGS for a portion of the fees in the Meister [m]atter was a purchase of a derivative cause of action against MSKF and Mazie, the defendants in the action brought by KGS.  This purchase by MSKF and/or Mazie was violative of public policy and other standards governing attorneys and referral fees and is null, void and of no force and effect.

where: it lacked jurisdiction over this issue; there was pending litigation in Morris County over Rosenbach's entitlement to a fee; the court's order granted ultimate relief to Rosenbach without any discovery; and Rosenbach was not a party to the fee split litigation. KGS contends for the first time that, if the order compelling payment of Rosenbach's referral fee is reversed, we should invalidate the assignment agreement and remand all remaining issues to the Morris County action. We decline to do so, as the issue is moot, given the outcome of the Morris County litigation.

V.

We summarize our decision. In A-3442-21, we affirm the trial court's dismissal order on standing grounds. In A-2744-20, we affirm the trial court's finding of justifiable withdrawal by Stone. We reverse and remand to the trial court to conduct a jury trial on the issue of fee allocation between KGS and MSKF, properly applying the La Mantia and RPC factors. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division